**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hubert Geroid BROWN, Defendant-Appellant.**

**No. 72-2181.**

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1973.

William M. Kunstler, New York City, Edward Carl Broege, Newark, N. J., Murphy W. Bell, Baton Rouge, La., David J. Dennis, New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Mary Williams Cazales, Asst. U. S. Atty., New Orleans, La., for plaintiff-appellee; Louis C. LaCour, U. S. Atty., Horace P. Rowley, III, Gene S. Palmisano, Robert O. Homes, Jr., Harry F. Connick, Asst. U. S. Attys., on the brief.

Before BELL, GOLDBERG and SIMPSON, Circuit Judges.

BELL, Circuit Judge:

This appeal is from a judgment of conviction entered on a jury verdict finding defendant guilty of transporting a firearm from New Orleans to New York while a passenger on Delta Airlines flight 818 in violation of 15 U.S.C.A. § 902(e).[1] (The Federal Firearms

1. It shall be unlawful for any person who is under indictment or who has been convicted of a crime punishable by imprisonment for a term exceeding one year . . . to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

Act) He was found not guilty on one additional count charging transportation of the same firearm from New York to New Orleans on a previous day. The gravamen of the offense was that he transported the firearm while under indictment. The contested fact issue was whether defendant knew at the time that he was under indictment in Maryland.

### I.

The somewhat contorted history of this case, with the long delay between conviction in 1968 and the present appeal, is the result of two prior appeals. On April 3, 1969, in accordance with the procedure followed in Alderman v. United States, 1969, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, this court remanded the case to the district court for a hearing to consider the effect of certain evidence obtained by wiretapping. (Unreported order dated April 3, 1969 in Brown v. United States, No. 26,249).

Following an *Alderman* hearing and in camera inspection, the district court, 317 F.Supp. 531 (E.D.La.1970), found that three of the four documents containing wiretapped conversations (Exhibits 1–1, 1–2, and 1–3), were obtained by electronic surveillance authorized by the Attorney General and made solely for the purpose of gathering foreign intelligence. As to these three foreign intelligence wiretaps, the court held (1) that they were legal, albeit warrantless, and (2) that the information contained therein was in no way related to the prosecution's case. The district court therefore ordered that the contents of the wiretaps would not be disclosed to defendant.

The fourth document (Exhibit 1–4), contained information overheard by Louisiana state officials who monitored some of the telephone conversations of prisoners in their custody by listening on a telephone extension. The federal government used the state jail facilities in New Orleans for holding federal prisoners. After indictment and while incarcerated in the state facility, jail officials recorded some of defendant's conversa-

tions and passed one recording to New Orleans police. The substance of this recording was then divulged to an F.B.I. agent who incorporated it in a memorandum which is Exhibit 1–4.

The only part of Exhibit 1–4 which is related to defendant's case is the report of a conversation between defendant Brown and his attorney, William Kunstler, Esq., as follows:

At approximately 2:30 PM, on February 29, 1968, H. Rap Brown telephonically contacted his attorney William Kunstler in New York City. Brown advised Kunstler that New Orleans was "ready to go" as was Baton Rouge which was especially "hot" at Southern University in that city. Brown indicated that all that was necessary was mobilization of forces and he requested that Stokley Carmichael come to New Orleans on March 2, 1968. Kunstler stated he would attempt to make arrangements with Carmichael and that Carmichael would most likely also travel to Baton Rouge, Louisiana.

Kunstler advised Brown that he had obtained 30 minutes of time on three radio stations (location not indicated) and that a big press release had been prepared regarding Brown's cause. Kunstler indicated that Brown has the full cooperation of all Civil Rights organizations.

Kunstler advised that Ed Milbrook (Phonetic) would be visiting Brown at the Orleans Parish Prison, New Orleans, Louisiana, where he is presently incarcerated. Kunstler stated that Brown could expect to remain in Orleans Parish Prison until March 20, 1968, at which time Kunstler would attempt to obtain his release for return to New York City.

While finding Exhibit 1–4 to be the product of illegal surveillance, the district court held that the information obtained in no way prejudiced defendant or tainted his conviction.

Following the district court's findings on the wiretap claims, this case was

again appealed to this court. However, at some point in the proceedings Brown became a fugitive from justice. Consequently a panel of this court ordered the appeal stricken from the docket but on condition that it be reinstated if and when it should be made known to the court that Brown was subject to the court's jurisdiction. United States v. Brown, 5 Cir., 1972, 456 F.2d 1112. Finally, in June of 1972, Brown appeared before the district court and was re-sentenced to five years imprisonment and a fine of $2,000. This appeal followed. We affirm.

## II.

There are seven assignments of error to be considered on this appeal:

(1) the government's proof of an essential element of the crime, actual knowledge of the Maryland indictment, was insufficient as a matter of law;

(2) the court's instructions on the issue of actual knowledge were contradictory and prejudicial;

(3) the court should have granted defendant's motion for a change of venue because the security measures employed at his trial denied him a fair trial;

(4) 15 U.S.C.A. § 902(e) is unconstitutional for the reasons that in prohibiting a person under indictment from carrying firearms, the statute imposes an arbitrary classification and also violates the individual's right to be presumed innocent;

(5) the alleged invalidity of the Maryland indictment necessitates a reversal;

(6) the overhear of counsel in the telephone conversation between defendant and his attorney (Exhibit 1–4, *supra*), violated defendant's right to counsel under the Sixth Amendment and mandates at least a new trial, and

(7) the court erred in refusing to hold an adversary hearing on the relevance of the materials contained in Exhibits 1–1, 1–2, and 1–3, discussed *supra*.

We will consider these assignments of error seriatim.

## III.

■ First, as to lack of proof, 15 U.S.C.A. § 902(e), under which defendant was convicted, provides that "[I]t shall be unlawful for any person who is under indictment . . . to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition." To prove a violation of § 902(e) it must be shown that a defendant actually had knowledge of a pending indictment while he transported a firearm in interstate commerce. Cf. Costello v. United States, 8 Cir., 1958, 255 F.2d 389, 396.

■ Defendant argues that the government's proof of his actual knowledge of the pending Maryland indictment was insufficient as a matter of law. On appeal the jury's finding of actual knowledge must be sustained if there is substantial evidence taking the view most favorable to the government to support it. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Harper, 5 Cir., 1971, 450 F.2d 1032, 1040. While the government did not introduce any direct evidence to prove that the defendant actually knew of the Maryland indictment, there was a substantial body of circumstantial evidence on which the jury might have based its verdict. The evidence will be briefly summarized.

When the indictment was returned, about noon on August 14, 1967, Brown was in Los Angeles. Shortly thereafter he boarded a plane and returned to New York where he was met by a group of friends at the airport. The government proved that news of Brown's indictment was carried by all major news media in the New York area, as well as news media in New Orleans and Baton Rouge, Louisiana. For the next day and a half, Brown remained in New York visiting with friends including his attorney, William Kunstler, Esq. On the afternoon of August 16, Brown and his bodyguard, Frazier, flew to New Orleans carrying the weapon in question, an "M-1 carbine." Although traveling incognito,

Brown was recognized, photographed, and interviewed by the press in New Orleans. He also talked with some of his supporters during his two hour stay. From New Orleans, Brown and Frazier left by bus for Baton Rouge where Brown's parents resided. While staying with Brown's parents in Baton Rouge, Brown received about fifty visitors. He also visited and talked with friends at a restaurant, a barber shop and a bar in Baton Rouge. It was also shown that the August 15 edition of the Baton Rouge State-Times was delivered to the home of Brown's parents on August 15. This edition of the newspaper carried on the front page, a headline entitled "RAP BROWN INDICTED FOR ARSON."

Based on this evidence, the government argued that it would have been unreasonable to conclude that Brown was unaware of the indictment. The jury verdict implicitly included a finding that Brown did have actual knowledge of the indictment. It can be overturned only if we conclude that the jury must necessarily have had a reasonable doubt as to his actual knowledge. United States v. Warner, 5 Cir., 1971, 441 F.2d 821, 825. We cannot say, in light of the sum of this evidence, that the jury must necessarily have had reasonable doubt about his actual knowledge. We therefore hold that the evidence was legally sufficient to sustain the verdict.

Second, defendant urges that the district court gave contradictory instructions on the issue of actual knowledge. We have carefully examined the charge and find no merit in this contention.

Some evidence of the care with which the jury followed the instructions on the necessity of knowledge of the indictment and proof by circumstantial evidence will be seen in the finding of not guilty on the count involving transportation of the firearm from New York to New Orleans. The additional proof of the headline in the Baton Rouge newspaper was substantial and could well have been the factor which caused the guilty verdict on the count which related to transporting the firearm thereafter.

We likewise find without merit the claim asserted in the third assignment of error, that defendant's motion for a change of venue should have been granted. We are unable to conclude that the security measures employed at the trial reached such proportions as to deny defendant a fair trial. There was no mob dominated atmosphere as in Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; nor publicity or television problems of the kind involved, respectively, in Sheppard v. Maxwell, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; and Estes v. Texas, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543. The transcript of the trial discloses that defendant's right to a fair trial was carefully guarded by the district court in the context of the security problem obtaining at the time.

Four, we find no merit in the claim that § 902(e) is unconstitutional for the alleged reason that it draws no distinction between indictment for crimes of violence and non-violence, or because it is an undue restriction on the presumption of innocence.

We note that Congress has broad power to regulate interstate activities under its commerce power. See Heart of Atlanta Motel v. United States, 1964, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258; Katzenbach v. McClung, 1964, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290. We must uphold the constitutionality of the regulation involved here unless we determine that there is no rational basis for the congressional classification. See Heart of Atlanta Motel, *supra,* 379 U.S. at 258, 85 S.Ct. 348. 15 U.S.C.A. § 902(e) prohibits the interstate carriage of firearms by a person who is under indictment for an offense punishable by imprisonment for more than a year. We are unable to conclude that this classification is without rational basis. The differentiation of the statute among indicted persons

according to the seriousness of the crimes with which they are charged is, without more, sufficient in our judgment. See United States v. De Pugh, W.D.Missouri, 1967, 266 F.Supp. 453, aff'd 8 Cir., 393 F.2d 367.

Nor do we find any merit in the contention that § 902(e) violates the presumption of innocence. Persons under indictment are often subject to restraints on their freedom and the restriction here is not of such weight as to offend the presumption.

■ Five, defendant contends that the invalidity of the Maryland indictment necessitates a reversal of his Louisiana conviction. Even assuming *arguendo* that the underlying indictment is later found invalid, the crime under § 902(e) is complete when a firearm is carried in interstate commerce by a person then under indictment. United States v. Quiroz, 9 Cir., 1971, 449 F.2d 583, 584–585; United States v. De Pugh, *supra*. Thus this contention is also without merit.

## IV.

With respect to Exhibit 1–4 defendant urges that a new trial is required because (1) the unlawful wiretap and subsequent overhear invaded his Sixth Amendment right to counsel, and (2) the contents of the invasion were not disclosed until after conviction. This contention is discussed at some length in the opinion of the district court. United States v. Brown, E.D.La., 1970, 317 F. Supp. 531.

This argument is premised on the proposition that any undisclosed government overhear of an attorney-client conversation requires a new trial irrespective of whether the information obtained is relevant. Defendant maintains that the per curiam decisions in Black v. United States, 1966, 385 U.S. 26, 87 S. Ct. 190, 17 L.Ed.2d 26, and O'Brien v. United States, 1967, 386 U.S. 345, 87 S. Ct. 1158, 18 L.Ed.2d 94, require this conclusion. We cannot agree.

In Hoffa v. United States, 1967, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, a case involving an alleged overhear of Hoffa's counsel in person by a government informer, and decided after *Black* and before *O'Brien*, the Supreme Court examined in more detail the problem of governmental intrusion upon the attorney-client relationship. Two cases decided by the District of Columbia Circuit, holding that a surreptitious invasion by a government agent into the legal camp of the defense violates the protection of the Sixth Amendment, were cited with approval in *Hoffa*. Caldwell v. United States, 1953, 92 U.S.App.D.C. 355, 205 F.2d 879; Coplon v. United States, 1951, 89 U.S.App.D.C. 103, 191 F.2d 749. However, the Court carefully noted that both *Caldwell* and *Coplon* "dealt with government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel." *Hoffa, supra*, 385 U.S. at 306, 87 S.Ct. at 416.

■ In light of the discussion in *Hoffa* with regard to "intrusion of the grossest kind", and the fact that neither *Black* nor *O'Brien* expressly states that any undisclosed overhear, regardless of circumstances or relevancy, violates the Sixth Amendment, we decline to adopt such a rule. Instead, we proceed to consider the circumstances which led to the overhear and the question of whether the overhear could have in any fashion tainted the conviction.

■ The overhear involved in the instant case resulted from the actions of the state officials. There is no indication that defendant's telephone conversations were monitored for the purpose of gaining information to use at his trial, a practice we would immediately proscribe with appropriate remedy. Instead, testimony adduced at an adversary hearing on the question disclosed that state prison officials followed a practice of monitoring some of the telephone conversations of prisoners in their custody for security reasons. The surveillance was neither authorized nor approved by fed-

eral authorities. Indeed, there was no evidence that the Federal authorities were aware of the state practice.[2] We therefore conclude that the facts presented do not demonstrate the type of governmental intrusion upon the confidential relationship between defendant and his counsel which would, without more, require a new trial.

Concluding that neither the type of overhear, standing alone, nor the circumstances surrounding it resulted in a violation of the right to counsel, the question remains whether the overhear tainted defendant's conviction. The substance of the only conversation between defendant and his counsel, Kunstler, is quoted *supra.* p. 421. Defendant does not seriously contend and we cannot conclude that this conversation in any way tainted defendant's conviction. Cf. In Re Tierney, 5 Cir., 1972, 465 F.2d 806, 813.

### V.

We turn now to Exhibits 1–1, 1–2, and 1–3, warrantless wiretaps authorized by the then Attorney General acting for the President, prior to January 10, 1968, the date of the wiretaps. The district judge examined these exhibits as well as the authorization *in camera* and concluded (1) that they were legal wiretaps made for the purpose of gathering foreign intelligence and (2) that they contained nothing which would be even arguably relevant to defendant's case. In fact, the involvement of defendant in the wiretaps was happenstance at the most. On appeal, defendant argues that the wiretaps were illegal and therefore un-

der *Alderman* he is entitled to disclosure and an adversary hearing on relevancy.

*Alderman* requires disclosure and an adversary proceeding only if the trial court determines that the government's electronic surveillance was unlawful. *Alderman, supra,* 394 U.S. at 170 n. 3, 89 S.Ct. 961; Giordano v. United States, 1969, 394 U.S. 310, 312–313, 89 S.Ct. 1163, 22 L.Ed.2d 297. Thus the issue presented to us is whether the trial court correctly determined that the wiretaps were lawful. This issue requires us to decide a question which was expressly reserved by the Supreme Court in United States v. United States District Court, 1972, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752; that is, whether the President, acting through the Attorney General, has the constitutional power to conduct warrantless electronic surveillance for the purpose of obtaining foreign intelligence.

In *United States District Court,* the Supreme Court held that the President did not have the power to authorize electronic surveillance in internal security matters without prior judicial approval. However, the Court was at pains to distinguish between surveillance of domestic organizations deemed threats to national security and surveillance involving the activities of foreign powers or their agents. 407 U.S. at 308 and at 321–322, 92 S.Ct. 2125.

While the Court carefully reserved the question of presidential power with respect to foreign threats to national security, reference was made in a footnote to the view of others that warrantless surveillance may be constitutional where foreign powers are involved even though

2. This question is to be distinguished from "silver platter" problems arising from state originated evidence being made available to federal prosecutions. Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669. We do not here deal with whether to admit evidence, harmful to the appellant, which was gathered by state authorities in violation of constitutional rights. Rather, we are concerned with the circumstances and scope of the instrusion on the attorney-

client privilege. Our question is whether the intrusion, by either state or federal officers, is so gross as to justify a new trial regardless of the relevancy of the information obtained. In our opinion it is relevant to this issue that the overhear was by state officials, solely in the discharge of their prison security responsibilities, rather than by federal officials seeking to facilitate their prosecution of the appellant.

impermissible in domestic security cases. 407 U.S. at 322 n. 20, 92 S.Ct. 2125. (Citing United States v. Smith, C.D.Cal., 1971, 321 F.Supp. 424; United States v. Clay, 5 Cir., 1970, 430 F.2d 165; ABA Criminal Justice Project, Standards Relating to Electronic Surveillance, Feb. 1971, pp. 11, 120, 121).

In United States v. Clay, 5 Cir., 1970, 430 F.2d 165, 170–172, rev'd on other grounds, 1971, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810, the case referred to in the Supreme Court's footnote 20, we concluded that the President had such authority over and above the Warrant Clause of the Fourth Amendment.

We found that authority in the inherent power of the President with respect to conducting foreign affairs. We took our text from Chicago & Southern Air Lines v. Waterman S.S. Corp., 1948, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568, where the Supreme Court stated:

> [T]he President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret. 333 U.S. at 111, 68 S.Ct. at 436.

See also United States v. Belmont, 1937, 301 U.S. 324 at 328, 57 S.Ct. 758, 81 L. Ed. 1134.

The constitutional power of the President is adverted to, although not conferred, by Congress in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C.A. §§ 2510–2520. 18 U.S.C.A. § 2511(3) of that Act provides as follows:

> "Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts

of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. . . ."

 As *United States District Court* teaches, in the area of domestic security, the President may not authorize electronic surveillance without some form of prior judicial approval. However, because of the President's constitutional duty to act for the United States in the field of foreign relations, and his inherent power to protect national security in the context of foreign affairs, we reaffirm what we held in United States v. Clay, *supra,* that the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence. Accord, Zweibon v. Mitchell, D.D.C.1973, 363 F.Supp. 936; United States v. Butenko, D.N.J., 1970, 318 F.Supp. 66, Restrictions upon the President's power which are appropriate in cases of domestic security become artificial in the context of the international sphere. United States v. Smith, *supra,* 321 F.Supp. at 430 (dicta).

Our holding in *Clay* is buttressed by a thread which runs through the Federalist Papers: that the President must take care to safeguard the nation from possible foreign encroachment, whether in its existence as a nation or in its intercourse with other nations. See e. g., The Federalist No. 64, at 434–36 (Jay); The Federalist No. 70, at 471 (Hamilton); The Federalist No. 74 at 500 (Hamilton) (J. Cooke ed. 1961).

 We thus conclude that the wiretaps involved in Exhibits 1–1, 1–2, and 1–3 were lawful and that their disclosure was not required. *Alderman, supra,* 394 U.S. at 170 n. 3, 89 S.Ct. 961. Moreover, we hold, after *in camera* examination, that the information disclosed by the wiretaps had no relevancy whatever to the crime here in question, either directly or indirectly.

In sum, we agree with the following statement of the District Court which is

couched in the precise terms of our decision in United States v. Clay, *supra,* 430 F.2d at 170.

From an *in camera* examination of Exhibits 1–1, 1–2, and 1–3, we find that these logs were authorized by the then Attorney General in writing; they were not made pursuant to a surveillance of defendant but rather of others, and the premises were identified; that they were made in connection with obtaining foreign intelligence information; that the Executive Branch of the Government has properly and reasonably requested these exhibits not be disclosed to the defendant or the public because "it would prejudice the national interest to disclose the particular facts concerning this surveillance other than to the Court in camera" and its contents do not in any manner bear upon the issues involved in this case, and in no way have these wiretaps prejudiced defendant, helped build a case against him, or assisted in bringing about his conviction.

We thus find no merit in the assignments of error.

Affirmed.

GOLDBERG, Circuit Judge (specially concurring):

I concur not only in the affirmance of this conviction, but also in the opinion of the Court. My words of special concurrence relate only to Part V and are intended merely to make explicit what is now implicit in the excellent opinion of my Brother Bell.

There can be no quibble or quarrel with the findings and conclusions that the wiretap under consideration here had its origin and complete implementation in the field of foreign intelligence. This Court and the able district judge have conducted inescapably independent reviews of the action of the then Attorney General in authorizing this warrantless electronic surveillance. All agree in the determination that the wiretap was indeed directly related to legitimate foreign intelligence gathering activities for national security purposes; and that it was, therefore, a legal wiretap and not within the ambit of Alderman v. United States, 1969, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. This case in no way involved the spurious use of national security as a cover for warrantless electronic surveillance of accused and potential criminal defendants, domestic radicals, or political dissenters; and the panel opinion narrowly barricades warrantless wiretaps within the confines of legitimate foreign intelligence surveillance.

It is unfortunate for the development of the law in this area of foreign intelligence wiretapping that the essential information on which the legality of executive action turns—the subject, location, scope, and duration of the surveillance —cannot be revealed. This circumstance places tremendous responsibility for both national security and cherished constitutional rights in the hands of individual judges, acting largely in ignorance of the related decisions of their colleagues and permanently insulated from the helpful criticisms and suggestions that result from the adversary process and the publication of explanatory opinions. Nevertheless, it remains the difficult but essential burden of the courts to be ever vigilant, so that foreign intelligence never becomes a *pro forma* justification for any degree of intrusion into zones of privacy guaranteed by the Fourth Amendment. Courts must insure that there be no future tidal wave of warrantless wiretaps and that the floodgates controlling their use not be opened for domestic intelligence purposes. The judiciary must not be astigmatic in the presence of warrantless surveillance; rather judges must microscopically examine the wiretaps in order to determine whether they had their origin in foreign intelligence or were merely camouflaged domestic intrusions. The serious step of recognizing the legality of a warrantless wiretap can be justified only when, as in the case before us, the foreign and sensitive nature of the government surveillance is crystal clear.

We must not trespass into the field of foreign intelligence and frustrate the executive in the pursuance of its obligations to conduct our foreign affairs. The Fourth Amendment, however, is no less a part of our Constitution than Article II, and its great protection against unreasonable invasions of privacy must remain inviolate. The fact that we develop the law of national security wiretaps largely *in camera* can never be allowed to lessen our zeal in the protection of fundamental rights. Indeed, the very secrecy surrounding our decisions requires that we give the closest scrutiny to executive assertions of national security interest.