**UNITED STATES of America**

v.

**Thomas FALVEY, Michael Flannery, George Harrison, Patrick Mullin, and Daniel Gormley, Defendants.**

**No. 81 Crim. 423(S-2).**

United States District Court, E. D. New York.

June 15, 1982.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y. (David V. Kirby, Asst. U. S. Atty., Brooklyn, N. Y., Mary C. Lawton, Lubomyr M. Jachnycky, Washington, D. C., of counsel), for the Government.

William Mogulescu, New York City, for defendant Thomas Falvey.

Michael Kennedy, P. C., New York City (Michael Kennedy, Sheryl E. Reich, New York City, Jeffrey Gleason, Law Student, John Privitera, Washington, D. C., of counsel), for defendant Michael Flannery.

O'Dwyer & Bernstien, New York City (Frank Durkan, Franklin Siegel, New York City, of counsel), for defendant George Harrison.

Manton, Pennisi & Dowd, Kew Gardens, N. Y. (Michael Dowd, Kew Gardens, N. Y., of counsel) for defendant Patrick Mullin.

David L. Lewis, New York City, for defendant Daniel Gormley.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

The defendants, all of Irish ancestry and all "active in the cause of Irish unity," are accused of smuggling arms and equipment from this jurisdiction, to the Provisional Irish Republican Army ("IRA") in Ireland. Affidavit of Michael Kennedy ("Kennedy Aff."), ¶¶ 9, 10. The indictment charges conspiracy and numerous offenses relating to the purchase of arms and ammunition in violation of 18 U.S.C. § 371; 26 U.S.C. §§ 5841, 5842, 5845, 5861, 5871; and 22 U.S.C. § 2778.

The Government has informed the defendants that it engaged in electronic surveillance of some of the defendants and that it intends to introduce at trial certain tape recordings of telephone conversations that were intercepted pursuant to the procedures of the Foreign Intelligence Surveil-

lance Act of 1978 ("FISA"), 50 U.S.C. §§ 1801–1811. The Government moves under 50 U.S.C. § 1806(f), (g) for an Order declaring that the surveillance in this case was lawfully authorized and conducted. The defendants counter with a motion to suppress all the fruits of the FISA surveillance on the grounds that FISA, on its face and as applied in this case, violates the First, Fourth, Fifth, Sixth and Ninth Amendments and Articles I and III of the Constitution.[1]

### A. The FISA Investigation

Sometime during 1980, the Federal Bureau of Investigation ("FBI") commenced a foreign counter-intelligence investigation of a "suspected international terrorist organization operating in the New York area." Affidavit of David V. Kirby ("Kirby Aff."), ¶ 2. On April 3, 1981, as part of this investigation a judge of the Foreign Intelligence Surveillance Court authorized electronic surveillance of defendants Falvey and Harrison, both United States citizens.[2] *Id.*; Kennedy Aff., ¶ 22. From early April 1981 until June 19 or 20, 1981, when defendants Falvey and Harrison were arrested, the FBI conducted the authorized electronic surveillance. Kirby Aff., ¶ 2. Telephone conversations were intercepted and taped, some of which the Government states are relevant to this prosecution. *Id.* at ¶¶ 4, 5.

Pursuant to FISA, the Government obtained the Attorney General's approval and informed the defendants and this court of its intention to use tapes of the relevant conversations at trial. 50 U.S.C. § 1806(b), (c). It provided the defendants with copies of transcripts of conversations it deemed relevant to this case, and the minimization logs of all the wiretaps on Falvey's and Harrison's telephones, but refused to disclose any other intercepted communications.[3] Kirby Aff., ¶ 5; Kennedy Aff., ¶¶ 24–26, 28, 30.

### B. Pre-FISA History of Foreign Intelligence Electronic Surveillance.

To place the constitutional issues raised by these motions in focus, some appreciation of history is required. Over forty-years ago, under orders from President Franklin D. Roosevelt, the Executive branch began to conduct warrantless electronic surveillance in "grave matters involving the defense of the nation." *See* S.Rep.No.95–604, 95th Cong., 2d Sess., *reprinted in* 4 U.S.Code Cong. & Admin.News 3904, 3911 (1978) ("Legislative History").[4] The constitutionality of this sort of surveillance went unchallenged and successive administrations continued to broaden this amorphous "national security exception" to the warrant requirement of this Fourth Amendment. Even Congress avoided the issue of its constitutionality. Indeed, in 1968 when it enacted Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 *et seq.*, which prohibits most warrantless electronic surveillance, Congress specifically refused to regulate foreign intelligence electronic surveillance and, instead, "left presidential powers where it found them." *United States v. United States District Court*, 407 U.S. 297, 303, 92 S.Ct. 2125, 2129, 32 L.Ed.2d 752 (1972) (hereinafter referred to as "*Keith*"). *See* 18 U.S.C. § 2511(3).[5]

---

**1.** To the extent that the defendants assert that FISA is overbroad, all of them have standing. *See, e.g., Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

**2.** FISA defines electronic surveillance to be "the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication . . . ." 50 U.S.C. § 1801(f)(1).

**3.** The government has not suggested that it intends to introduce at trial those portions of the intercepted communications which it refuses to make available to defendants.

**4.** For a detailed history of warrantless electronic surveillance since 1940, see Legislative History, *supra* at 3910–3916; Note, *The Foreign Intelligence Surveillance Act: Legislating a Judicial Role in National Security Surveillance*, 78 Mich.L.Rev. 1116 (1980); Note, *The Foreign Intelligence Surveillance Act of 1978*, 13 Vand. J.Trans.L. 719 (1980).

**5.** Prior to the enactment of Title III, § 605 of the Federal Communications Act of 1934 also specifically prohibited the interception of non-consensual warrantless wiretaps. 47 U.S.C. § 605. Section 2511(3) of Title III provided that neither Title III nor § 605 "shall limit the

Since the Watergate tragedy, however, when gross abuses of the executive's presumed authority to conduct warrantless electronic surveillance in the name of national security first came to light, there has been an understandable anxiety about unrestrained electronic surveillance.[6] Indeed, the Watergate era spawned the first real test of the Executive's power to conduct warrantless electronic surveillance in the name of national security. *See Keith,* 407 U.S. at 299, 314–21, 92 S.Ct. at 2128, 2135–2138.

Distinguishing between domestic and foreign security, the Supreme Court, in *Keith,* held that a claim of national security would no longer justify warrantless electronic surveillance having a *domestic* rather than foreign focus. *Id.* at 323–24, 92 S.Ct. at 2139–2140. The Court was not confronted with, and accordingly failed to address, the constitutionality of warrantless electronic surveillance in cases involving a foreign power or its agents. *Id* at 321–22 & n.20, 92 S.Ct. at 2138–2139 & n.20. It recognized, however, that there were distinctions between Title III criminal surveillances and those involving the national security, and urged Congress to delineate an appropriate stan-

dard for issuing warrants where national security was at stake. *Id.* at 322–23, 92 S.Ct. at 2139.

This invitation, along with the public's concern about Executive wiretaps and the uncertainty of the law,[7] ultimately led in 1978 to the enactment of FISA. *See* S.Rep. No.95–604, Legislative History, *supra* at 3916–17.[8] Whether FISA strikes an appropriate balance between the Government's need to conduct foreign intelligence surveillance and its citizens' rights to freedom from unreasonable governmental intrusion is a matter of national concern. The resolution of this issue, a case of first impression, must begin with a brief review of the provisions of FISA.

### C. FISA Provisions

FISA establishes standards for obtaining a court order authorizing foreign intelligence electronic surveillance.[9] It created a Foreign Intelligence Surveillance Court on which seven United States District Court Judges, selected by the Chief Justice of the United States, sit. 50 U.S.C. § 1803(a).

To obtain a surveillance order, a federal officer, having first obtained the Attorney General's approval, must submit an applica-

---

constitutional power of the President ... to obtain foreign intelligence information deemed essential to the security of the United States ...." This section was repealed by the enactment of FISA. *See* Pub.L. 95–511, Title II, § 201(c), Oct. 25, 1978, 92 Stat. 1797.

**6.** At the time, claims of national security were used to justify warrantless wiretapping of dissident groups (which were interpreted to include the Democratic Party) that had no foreign nexus. *See* S.Rep.No.95–604, Legislative History, *supra* at 3916-17; *Keith,* 407 U.S. at 314, 92 S.Ct. at 2135.

**7.** Three Courts of Appeals have ruled on the issue whether warrantless foreign intelligence electronic surveillance is constitutional. The Third and Fifth Circuits held that the Executive had the inherent constitutional power to conduct such surveillance. *See United States v. Butenko,* 494 F.2d 593 (3d Cir.) (en banc), *cert. denied sub nom., Ivanov v. United States,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). Only the D. C. Circuit, in a plurality opinion, questioned the constitutionality of this type of surveillance. *Zweibon*

*v. Mitchell,* 516 F.2d 594 (D.C.Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). The Second Circuit has declined to take a position. *See United States v. Ajlouny,* 629 F.2d 830, 840 (2d Cir. 1980), *cert. denied,* 449 U.S. 111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981).

**8.** Even if the President has "inherent" constitutional power, pursuant to his Article II foreign policy powers, to conduct warrantless searches, "Congress has the power to regulate the exercise of this authority by legislating a reasonable warrant procedure ...." S.Rep. No.95–604, Legislative History, *supra* at 3917. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J. concurring). *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 322, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936); *See also Perez v. Brownell,* 356 U.S. 44, 62, 78 S.Ct. 568, 578, 2 L.Ed.2d 603 (1958).

**9.** FISA also permits warrantless electronic surveillance in certain limited circumstances which are not involved here. 50 U.S.C. § 1802, § 1805(e).

tion to one of the FISA Court judges. 50 U.S.C. § 1804(a) The application must detail the identity of the target; the information relied on by the Government to demonstrate that the target is a "foreign power" or an "agent of a foreign power;" evidence that the place where the surveillance will occur is being used, or is about to be used by the foreign power or its agent; the type of surveillance to be used; the minimization procedures to be employed; and certification that the information sought is "foreign intelligence information." *See* 50 U.S.C. § 1804(a)(1–11).

Before issuing the order, the FISA judge must make specific findings, including that:

there is probable cause to believe that (A) the target of the electronic surveillance is a foreign power or an agent of the foreign power: *Provided*, That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States ....

50 U.S.C. § 1805(a)(3)(A). *See also* 50 U.S.C. § 1805. An Order directed against an agent of a foreign power, as here, is valid for 90 days, but extensions may be obtained. 50 U.S.C. § 1805(d)(1), (2).

In this case, the FISA Court signed an order against two "agents of a foreign power", Thomas Falvey and George Harrison, who were so described because, as "United States persons," they allegedly "knowingly engage[d] in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power ...." 50 U.S.C. § 1801(b)(2)(C).

The "foreign power" is the IRA, allegedly "a group engaged in international terrorism or activities in preparation therefor ...." 50 U.S.C. § 1801(a)(4). "International terrorism" is defined as "violent acts or acts dangerous to human life that ... appear to be intended ... to influence the policy of a government by intimidation or coercion ... and occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished." 50 U.S.C. § 1801(c). The "foreign intelligence information" sought in this case is defined in FISA as "information that relates to ... the ability of the United States to protect against ... international terrorism" and which is necessary to "the conduct of the foreign affairs of the United States." 50 U.S.C. § 1801(e)(1)(B) and (e)(2)(B).

Should the surveillance produce any information that would be relevant in a criminal proceeding, section 1806 of FISA establishes procedures for the use of the information. 50 U.S.C. § 1806. First, authorization to use the information in a criminal proceeding must be obtained from the Attorney General. 50 U.S.C. § 1806(b). Then, the Government must notify the Court and the "aggrieved person" against whom the information will be offered. 50 U.S.C. § 1806(c).[10] Once the Government has notified the Court or if the aggrieved person moves to suppress the fruits of the FISA surveillance, section 1806(f) prescribes the exclusive procedures to be followed. S.Rep.No.95–604, Legislative History, *supra* at 3958–59.

Section 1806(f) provides that the court shall:

... if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted.

---

10. An aggrieved person is defined as "a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). Accordingly, Falvey and Harrison—whose phones were tapped—are aggrieved because they were the targets of the FISA wiretaps. Flannery and Gormley are aggrieved because their calls to Falvey's and Harrison's telephones were intercepted. There is no indication in the logs that Mullin's conversations were intercepted, and, accordingly, he is not an aggrieved person.

Since the Attorney General filed an affidavit in this case asserting that disclosure of information or an adversary hearing would harm the national security, the defendants are entitled to have this Court review, *ex parte* and *in camera* the surveillance order and accompanying application. Under the statutory scheme, a defendant is entitled, in the court's discretion, to disclosure of certain materials, "where such disclosure is necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).[11]

### D. The Constitutionality of FISA

FISA is the fifth legislative attempt since the Watergate era to bridle the Executive's "inherent" power.[12] Congress believes that FISA has provided a "secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights." S.Rep. 95–604, Legislative History, *supra* at 3916. The Act received broad support in Congress and from the then Attorney General Griffin Bell and President Carter.[13]

### 1. Fourth Amendment Arguments.

 Although neither the Supreme Court nor the Second Circuit has passed on the issue, three Circuit Courts have ruled that the Fourth Amendment does not require a warrant for electronic surveillance involving foreign intelligence and foreign powers.[14] *See United States v. Buck*, 548 F.2d 871, 875 (9th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 263, 54 L.Ed.2d 175 (1977); *United States v. Butenko*, 494 F.2d 593, 605 (3d Cir.) (en banc), *cert. denied sub nom., Ivanov v. United States*, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). Aware of the teachings of *Keith* that prior judicial approval is necessary when domestic national security interests are involved, the Third Circuit nevertheless found that the Executive's power to engage in warrantless foreign intelligence surveillance is "implied from his duty to conduct the nation's foreign affairs." *United States v. Butenko*, 494 F.2d at 603. *See* U.S.Const., Article II. Indeed, "the President must take care to safeguard the nation from possible foreign encroachment, whether in its existence as a nation or in its intercourse with other nations." *United States v. Brown*, 484 F.2d at 426. *See also* Jay, The Federalist No. 64, at 434–36; Hamilton, The Federalist No. 70, at 471; Hamilton, The Federalist No. 74, at 500. When, therefore, the President has, as his primary purpose, the accumulation of foreign intelligence information, his exercise of Article II power to conduct foreign affairs is not constitutionally hamstrung by the need to obtain prior judicial approval before engaging in wiretapping.[15]

11. This provision is similar to § 2518(10)(a) of the general wiretap statute which provides that the judge "in his discretion" may require disclosure "in the interests of justice." 18 U.S.C. § 2518(10)(a).

12. Prior attempts included: S. 3197, Foreign Intelligence Surveillance Act of 1976, 94th Cong., 2d Sess. (1976); S. 743, National Security Surveillance Act of 1975, 94th Cong., 1st Sess. (1975); S. 4062, Freedom from Surveillance Act of 1974, 93d Cong., 2d Sess. (1974); S. 2820, Surveillance Practices and Procedures Act of 1973, 93d Cong., 1st Sess. (1973).

13. *See* S.Rep. 95-604, Legislative History, *supra* at 3905-06.

14. The Supreme Court stated: "For the view that warrantless surveillance, though impermissible in domestic security cases, may be constitutional when foreign powers are involved, see *United States v. Smith*, 321 F.Supp. 424, 425–26 (C.D.Cal.1971); and American Bar Association Project on Standards for Criminal Justice, Electronic Surveillance 120, 121 (Approved Draft 1971 and Feb. 1971 Supp. 11). *See also United States v. Clay*, 430 F.2d 165 (CA5 [*rev'd on other grounds*, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1970)]". *Keith*, 407 U.S. at 322 n.20, 92 S.Ct. at 2139 n.20.

15. *Zweibon v. Mitchell*, 516 F.2d 594 (D.C.Cir. 1975), the only case cited by the defendants to suggest that a warrant is required even when foreign intelligence is the object of the surveillance, is inapposite. That case involved a domestic group that was not an agent of a foreign power. The only foreign connection was that

While the executive power to conduct foreign affairs exempts the President from the warrant requirement when foreign surveillance is conducted, the President is not entirely free of the constraints of the Fourth Amendment. The search and seizure resulting from the surveillance must still be reasonable. With the enactment of FISA, Congress has implemented the teaching of *Keith* and, by borrowing from Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 *et seq.*, the general wiretap statute, *mutatis mutandis*, Congress has fashioned a statute for foreign surveillance that fully comports with the Fourth Amendment.

It is at once evident that the procedures for obtaining a wiretap order under FISA are by no means identical with the procedures that must be followed under Title III. Defendants make much of this, arguing that Title III is the constitutional minimum to which they are entitled. The Supreme Court, however, has already held to the contrary. In *Keith* the Court recognized that surveillance in the interests of national security must be measured by a standard "less precise" than that used to limit conventional surveillance whose sole purpose is to obtain evidence of a crime. 407 U.S. at 322, 92 S.Ct. at 2139. *Keith* instructed Congress that it could promulgate standards so long as "they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens." *Id.* at 323, 92 S.Ct. at 2139. *See Camara v. Municipal Court*, 387 U.S. 523, 534–35, 87 S.Ct. 1727, 1733–1734, 18 L.Ed.2d 930 (1967). To that end, Congress could require "that the application and affidavit showing probable cause need not follow the exact requirements of [Title III, *i.e.*, probable cause to believe that a crime has been, or is about to be committed] but should allege other circumstances more appropriate to domestic security cases; [and] that the request for prior court authorization could in sensitive cases, be made to any member of a specially desig-

nated court . . . ." *Keith*, 407 U.S. at 323, 92 S.Ct. at 2139.

I find that Congress has struck a reasonable balance between the government's need for foreign intelligence information and the rights of its citizens. No one can gainsay that obtaining foreign intelligence relating to international terrorism is a legitimate object of the Executive's constitutional authority to conduct foreign policy. Indeed, to the extent that Article VI of the Constitution makes treaties the supreme law of the land, the United States is obligated to combat international terrorism under the multilateral treaty obligations it assumed as a member of the Organization of American States (*see*, OAS Convention on Terrorism, *done at* Washington, Feb. 2, 1971, *entered into force for the U. S.* Oct. 20, 1976, 27 U.S.T. 3949, T.I.A.S. 8413) and the United Nations (*see*, Convention on the prevention and punishment of crimes against internationally protected persons including diplomatic agents, *done at* New York, Dec. 14, 1973, *entered into force for the U. S.* Feb. 20, 1977, 28 U.S.T. 1975, T.I.A.S. 8532).

Furthermore, both the United States and the United Kingdom, as co-members of the U.N. Ad Hoc Committee on International Terrorism, support the principle that states must take all steps necessary to prevent the use of their territory and resources for aiding or encouraging people involved in acts of international terrorism (*compare* G.A. Res. 3034 (XXVII), U.N.Doc. A/8969, Dec. 18, 1972, *reprinted in* [1972] Y.U.N. 650 *with* draft resolution submitted by the United States, [1972] Y.U.N. 643–44). The United States is also required under international law to enact legislation to implement the policies embodied in treaties. *See* J.B. Moore, 5 Digest of International Law 222 (1906), *see also* OAS Convention on Terrorism, *supra*, art. 8. Congress was fully aware of its obligations when it enacted FISA: "Other factors [requiring this legislation] include the international responsibilities of the United States, the duties of the

---

the group's domestic activities could affect United States policy or pose a threat to United States security because the group irritated a

foreign power rather than collaborated with it. *Id.* at 652.

Federal Government to the States in matters involving foreign terrorism, and the need to maintain the secrecy of lawful counterintelligence sources and methods." S.Rep.No.95–604, Legislative History, *supra* at 3983. *See id.* at 3999.

One problem that particularly vexes the defendants is that, while an order for surveillance under Title III can be signed only if the judge finds "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . . " (18 U.S.C. § 2518(3)(a)), FISA requires only that the judge find "probable cause to believe that the target of the electronic surveillance is . . . an agent of a foreign power" 50 U.S.C. § 1805(a)(3)(A). I find, however, that the FISA probable cause standard fully satisfies the Fourth Amendment requirements as construed by the *Keith* Court. It provides "an effective external control on arbitrary executive action" and is a "fundamental safeguard for the civil liberties of the individual" because it requires that a federal district court judge [16]—not the Executive branch—make a finding of probable cause to believe that the target of surveillance is an agent of a foreign power. *See* S.Rep.No.95–604, Legislative History, *supra* at 3950. Implicit in this determination is a finding that the target is himself engaged in international terrorism, or "is conspiring with or knowingly aiding and abetting those who are, before electronic surveillance directed against him may be authorized under this chapter." *Id.* at 3925. *See also id.* at 3949.

■ I also find that the FISA procedures were properly employed in this case. The defendants argue that FISA was misused in this case because by the time the FISA surveillance began, the Government was clearly conducting a routine criminal investigation. Hence, runs the argument, the Government should have obtained a Title III order rather than a FISA order to insure the maximum constitutional protections for the defendants and a hearing should now be held to determine the purpose of the electronic surveillance.

This argument is not without appeal. Indeed, several courts have ruled that, while warrantless electronic surveillance is permissible when the purpose of the surveillance is to obtain foreign intelligence information, nevertheless, when the purpose of the surveillance is to obtain evidence of criminal activity, that evidence is inadmissible at trial. *See United States v. Truong Dinh Hung,* 629 F.2d 908, 912–13 (4th Cir. 1980); *United States v. Butenko,* 494 F.2d at 606.

In *Truong,* for example, the Executive branch had conducted warrantless wiretaps pursuant to its "inherent power." The Government admitted, however, that the "primary" purpose of the investigation had shifted from that of obtaining foreign intelligence information to that of obtaining evidence of a crime. The District Court admitted the wiretaps in a criminal prosecution that were obtained while the primary object was foreign intelligence information but excluded those obtained after the focus of the surveillance became evidence of criminality. 629 F.2d at 915–16. In doing so, it rejected the Government's argument "that, if surveillance is to any degree directed at gathering foreign intelligence, the executive may ignore the warrant requirement of the Fourth Amendment." *Id.* at 915. The bottom line of *Truong* is that evidence derived from *warrantless* foreign intelligence searches will be admissible in a criminal proceeding only so

---

**16.** A somewhat tortuous argument advanced by one of the defendants is that the Act violates Articles I and III because the FISA Court is not a court, and because Article III judges are being converted into Article I judges by serving as FISA judges. I reject this argument. Applications for Title III wiretaps are often taken to magistrates who are neither Article I nor Article III judges. Similarly, the finding of probable cause for a search warrant in a criminal case is commonly made ex parte by a magistrate. *See* 18 U.S.C. § 2518(3). *See, e.g., Keith,* 407 U.S. at 318, 321, 92 S.Ct. at 2137, 2138. The defendants have not persuaded me that a federal district court judge would become the Government's rubber stamp while acting as a FISA judge, or that a FISA judge would be any less neutral than a magistrate considering a Title III wiretap, or an application for a search warrant.

long as the primary purpose of the surveillance is to obtain foreign intelligence information.

What the defendants steadfastly ignore, however, is that in this case—unlike *Truong*—a court order was obtained authorizing the surveillance. After the surveillance was conducted in *Truong* (without a warrant), Congress enacted FISA, imposing a warrant requirement to obtain foreign intelligence information. *See* pp. 1312–1313, *supra.* An order authorizing the surveillance in this case was lawfully obtained pursuant to FISA. *See* p. 1316. Accordingly, all the relevant evidence derived therefrom will be admissible at trial.[17]

In enacting FISA, Congress expected that evidence derived from FISA surveillances could then be used in a criminal proceeding. *See* S.Rep.No.95–604, Legislative History, *supra* at 3940–41; 3979–80. Indeed, by affording mechanisms for suppression (50 U.S.C. § 1806(f)), and by providing for "retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed" (50 U.S.C. § 1801(h)(3)), FISA itself clearly contemplates that evidence will be used at trials.

In conclusion, it was proper for the FISA judge to issue the order in this case because of the on-going nature of the foreign intelligence investigation. *See* Kirby Aff., ¶ 2. *See also* p. 1316, *infra.* The fact that evidence of criminal activity was thereafter uncovered during the investigation does not render the evidence inadmissible. There is no question in my mind that the purpose of the surveillance, pursuant to the order, was the acquisition of foreign intelligence information. Accordingly, I find that the FISA procedures on their face satisfy the Fourth Amendment warrant requirement, and that FISA was properly implemented in this case.

2. *First Amendment Arguments.*

▮ The defendants mount a superficially attractive First Amendment attack on FISA. They argue that another problem with FISA is that it gives the Government the opportunity to use politically-motivated surveillance of whatever group it chooses at a particular time. According to the argument, at this time the Polish labor union, Solidarity, is in; and the IRA is out. At some future time, the roles may be reversed. But at all times, American sympathizers of either group will be afraid to exercise their First Amendment rights lest their privacy be invaded through FISA electronic surveillance.

The argument, however, ignores two things. First, abusive political surveillance is precisely what Congress intended to control by providing that a judge—and not the Executive branch—make the finding that the target is truly an agent of a foreign power. *See* S.Rep.No.95–604, Legislative History, *supra* at 3949–50. Second, because one man's terrorism may be another's holy war, FISA explicitly admonishes that "no United States person may be considered . . . an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States . . . ." 50 U.S.C. § 1805(a)(3)(A).

Hence, to obtain a FISA surveillance order, the Government must provide the FISA judge with something more than the target's sympathy for the goals of a particular group, in this case, the IRA. While it may be judicially noticed that the object of the IRA's activities is to unite the North and the South of Ireland into one independent country, it is equally manifest that the IRA engages in international terrorism. *See e.g.,* Bishop, *Law in the Control of Terrorism and Insurrection: The British Laboratory Experience,* 42 Law & Contemp. Problems 140 (1978). Its acts are obviously

---

17. A hearing is not required because the only question here is whether the order was properly issued. Defendants argue that the order was not properly issued, because from its inception this was a criminal investigation. To the contrary, I find that the order was properly issued, because the application clearly sought foreign intelligence information. *See* p. 1316 *infra.*

"intended (A) to intimidate or coerce a civilian population; (B) to influence the policy of a government by intimidation or coercion; or (C) to affect the conduct of a government by assassination or kidnapping" and thus are legitimately encompassed by FISA. 50 U.S.C. § 1801(c)(2). The FISA judge in this case found that the targets were engaged in these activities. It cannot seriously be suggested that any of these activities are protected by the First Amendment.

Moreover, requiring the FISA judge to find that the target is involved in these acts of international terrorism as part of its finding of probable cause to believe that the target is an agent of a foreign power, serves to limit the generality of the terms "agent of a foreign power" and "international terrorism". Accordingly, I find that the FISA provisions are not overbroad and unconstitutional on their face, and that the defendants' First Amendment rights were not violated in this case.

3. *Fifth and Sixth Amendment Arguments.*

■ The defendants contend that FISA violates their constitutional rights to counsel, to be present at all proceedings conducted against them, and to a public trial. As discussed above, FISA prescribes the exclusive procedures to determine the legality of FISA electronic surveillance. *See* S.Rep. No.95–604, Legislative History, *supra* at 4032. *See* pp. 1310–1311, *supra.* The Act states that if, as here, the Attorney General files an affidavit that disclosure would harm the national interest, the determination must be made *ex parte* and *in camera.* The reviewing court is permitted to order disclosure "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).

It is this clandestine feature of FISA that the defendants attack as unconstitutional. To the extent that the Act does not provide for a full-blown adversarial suppression hearing, at which they may examine the documents underlying the FISA Order, and the FISA Order itself, and cross-examine the Government witnesses, defendants contend FISA is unconstitutional.

Whatever appeal this argument may have, it ignores the massive body of pre-FISA case law of the Supreme Court, this Circuit and others, that the legality of electronic surveillance should be determined on an *in camera, ex parte* basis. *Giordano v. United States*, 394 U.S. 310, 314, 89 S.Ct. 1163, 1165, 22 L.Ed.2d 297 (1969); *Taglianetti v. United States*, 394 U.S. 316, 317, 89 S.Ct. 1099, 1100, 22 L.Ed.2d 302 (1969); *United States v. Ajlouny*, 629 F.2d at 839 (2d Cir. 1980); *Zweibon v. Mitchell*, 516 F.2d at 606 n.14; *United States v. Butenko*, 494 F.2d at 607; *United States v. Brown*, 484 F.2d at 425. For example, as the Second Circuit ruled, citing *Taglianetti v. United States*, 394 U.S. at 317, 89 S.Ct. at 1100: "adversary proceedings and full disclosure are not necessarily required 'for resolution of every issue raised by an electronic surveillance' . . . . To the contrary, such protections will not be required when the task is such that *in camera* procedures will adequately safeguard the defendant's Fourth Amendment rights . . . ." *United States v. Ajlouny*, 629 F.2d at 839.

■ The *ex parte, in camera* procedures of FISA are not unique to the foreign intelligence area. For example, the Second Circuit in *United States v. Manley*, 632 F.2d 978, 986 (2d Cir. 1980), upheld the use of an *ex parte, in camera* proceeding to determine the reliability of two non-disclosed informants whose information had led to the arrest of the defendant. The doctrinal rationale for this holding is that the confrontation right guaranteed by the Sixth Amendment does not apply at such a pretrial hearing. *McCray v. Illinois*, 386 U.S. 300, 313–14, 87 S.Ct. 1056, 1063–1064, 18 L.Ed.2d 62 (1967). Neither is there an absolute right to a public trial during pretrial suppression hearings. *Gannett Co. v. DePasquale*, 443 U.S. 368, 387–90, 99 S.Ct.

2898, 2909–2911, 61 L.Ed.2d 608 (1979). *See also United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976); *Dennis v. United States,* 384 U.S. 855, 875, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966); *Palermo v. United States,* 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959); *United States v. Pelton,* 578 F.2d 701, 707 (8th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978); *United States v. Buckley,* 586 F.2d 498, 506 & n.6 (5th Cir. 1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979).

Against this background, I find that the FISA procedures for reviewing the legality of a particular surveillance are constitutional. Accordingly, the Government's motion to review the legality of the documents underlying the FISA wiretap and the FISA order in this case is granted. Upon a review of those documents, I find that the Government's application, under 50 U.S.C. § 1804, and the FISA judge's order, under 50 U.S.C. § 1805, fully conform to the requirements of the Act.[18]

Specifically, I find (1) the President authorized the Attorney General to approve the application for electronic surveillance; (2) the application was made by a federal officer and approved by the Attorney General; (3) the application contained all statements and certifications required by the Act; and such certifications were not clearly erroneous; (4) there was probable cause to believe the targets, Harrison and Falvey, were agents of a foreign power, and this finding was not based solely on the basis of activities protected by the First Amendment; (5) there was probable cause to believe that the places at which the surveillance was directed were to be used by a foreign power; and (6) the minimization procedures employed were properly drawn. Finally, upon review, I find that disclosure to the defendants or their counsel of the materials reviewed is not "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).

Having considered all the defendant's arguments and having addressed the meritorious ones, I conclude that FISA is constitutional on its face, and as applied in this case. Accordingly, their motions to suppress the fruits of the FISA surveillance in this case are denied.

### CONCLUSION

1. The Government's motion to have the Court declare whether the FISA surveillance in this case was lawfully authorized and conducted is granted. Upon an *ex parte, in camera* review of the appropriate documents, I find that the electronic surveillance was lawfully authorized and conducted.

2. The defendants' motion to suppress the fruits of the FISA surveillance is denied.

SO ORDERED.

---

**18.** *See also In re Grand Jury Subpoena of Martin Flanagan,* 533 F.Supp. 957, 961 (E.D.N.Y. 1982).