**In the Matter of Harout KEVORK, Raffic Balian and Haig Gharakhanian.**

**In the Matter of a COMMISSION TO TAKE EVIDENCE PURSUANT TO the CRIMINAL CODE OF CANADA AND the U.S. CODE AND FEDERAL RULES, in Conjunction with a Canadian Prosecution, Styled:**

**Her Majesty The Queen, Respondent,**

**and**

**Harout Kevork, Raffic Balian and Haig Gharakhanian, Applicants.**

**Misc. No. 15837.**

United States District Court, C.D. California.

Aug. 5, 1985.

As Amended Aug. 6, 1985.

Supplemental Opinion Aug. 7, 1985.

Michael A. MacDonald, Counsel, Crown Law Office—Criminal, Ministry of the Atty. Gen., Toronto, Ontario, M.A.F. (Mac) Lindsay, Q.C., Sr. Asst. Crown Atty., Ministry of the Atty. Gen., Donald V. Macdougall, Asst. Crown Atty., Ministry of the Atty. Gen., Ottawa, Ontario, Robert A. Pallemon, Asst. U.S. Atty., Asst. Chief, Crim. Div., Terree A. Bowers, Asst. U.S. Atty., Los Angeles, Cal., for respondent.

Marlys Edwardh, Toronto, Ontario, Norman Boxall, Ottawa, Canada, Syman Zucker, Toronto, Canada, Michael J. Lightfoot,

Talcott, Vandevelde & Woehrle, Los Angeles, Cal., for defendants-applicants.

## INTRODUCTION

LACEY, District Judge.*

On May 8, 1985, by Order of the Honorable Mr. Justice C. Krever, the Supreme Court of Ontario issued an Order for a Commission to take the evidence of eight witnesses at Los Angeles, California. The Commission was signed and sealed on May 17, 1985. A letter of request in aid of said Commission then was directed to the appropriate Judicial Authority at Los Angeles, issued upon the certification of the Supreme Court of Ontario that:

> IT HAS BEEN SHOWN TO THIS COURT that it appears necessary for the purpose of justice that certain witnesses residing within your jurisdiction be examined there.

See Letter of Request, Exhibit 5 at page 2.

2. The Letter of Request specifically asked as follows:

> YOU ARE ALSO REQUESTED to permit the Commissioner to conduct the examination of the said witnesses *in accordance with the law of evidence and Rules of Civil Procedure of Ontario and the commission issued by this Court to the extent that it is possible to do so.* (emphasis added) *Id.*, page 5

Thereafter, on June 12, 1985, Order of the Honorable Manuel L. Real, Chief Judge, the United States District Court for the Central District of California, pursuant to 28 U.S.C. Section 1782, appointed United States District Judge Frederick B. Lacey and Supreme Court of Ontario Justice Eugene Ewaschuk "as Commissioners to obtain the evidence requested in the letter of request" and ordered:

> IT IS HEREBY ORDERED that the Commissioners conduct the examination of the said witnesses in accordance with the law of evidence and Rules of Civil

Procedure of the Province of Ontario and the Commission issued by the Supreme Court of Ontario to the extent that is possible to do so.

Pursuant to the Order of the United States District Court subpoenas issued to the eight witnesses specified in the Letter of Request. The Letter of Request specifically details that evidence of "intercepted private communications" is sought from S/A William Heaton of the Federal Bureau of Investigation.

The defendants Harouk Kevork, Raffic Balian and Haig Gharakhanian stand charged at Ottawa, Ontario, Canada, upon an indictment alleging as follows:

1. HAROUT KEVORK, RAFFIC BALIAN and HAIG GHARAKHANIAN stand charged that between the 1st day of January, 1981 and the 10th day of April, 1982, at the City of Ottawa, in the Judicial District of Ottawa-Carleton and elsewhere in the Province of Ontario and in Canada, they unlawfully did conspire together and with Sarkis Mareshlian and Hratch Bekredjian to commit the murder of a person, to wit: a Turkish diplomat, contrary to Section 423(1)(a) of the *Criminal Code of Canada.*

2. HAROUT KEVORK, RAFFIC BALIAN and HAIG GHARAKHANIAN stand charged that between the 1st day of January, 1981 and the 10th day of April, 1982, at the City of Ottawa, in the Judicial District of Ottawa-Carleton and elsewhere in the Province of Ontario and in Canada, they unlawfully did conspire together and with Sarkis Mareshlian and Hratch Bekredjian to cause another person, to wit: a Turkish diplomat, to be murdered, contrary to Section 423(1)(a) of the *Criminal Code of Canada.*

3. HAROUT KEVORK, RAFFIC BALIAN and HAIG GHARAKHANIAN stand charged that on or about the 8th day of April, 1982, at the City of Ottawa, in the Judicial District of Ottawa-Carleton, they unlawfully did attempt to murder KANI

* While regularly assigned to the District of New Jersey, Judge Lacey, for purposes of this matter, has been certified by the Chief Justice of the United States to sit in the Central District of California.

GUNGOR, a Turkish diplomat, contrary to Section 222 of the *Criminal Code of Canada.*

On June 12, 1985, the taking of evidence commenced at Los Angeles before the Commissioners. On June 15, 1985, the within motions by the defendants were brought. Following a recess; the proceedings resumed on August 1, 1985, with argument on these motions.

## DISCUSSION

The Crown has instituted this Section 1782 proceeding in order that it might adduce certain evidence and testimony before the aforesaid Commission. The evidence and testimony now proposed to be offered through an FBI witness or witnesses consists largely, if not exclusively, of the defendants' conversations that were overheard by the United States pursuant to orders of the Foreign Intelligence Surveillance Court issued under 50 U.S.C. Sections 1801, *et seq.*[1] The conversations were overheard by microphones installed in the residence of Hratch Kozibioukian, not a defendant in this proceeding, and by a tap on his telephone, in April, 1982; however, the Crown will tender here only those conversations overheard on the telephone.

The defendants have moved, on various theories, to block the Commission from receiving the aforesaid testimony and evidence. It has been agreed by all counsel that these motions must be determined by Judge Lacey sitting as a United States District Judge rather than by Justice Ewaschuk and Judge Lacey as Commissioners, because they and the question of whether the Commission may receive the evidence and testimony intended, require application of the Foreign Intelligence Surveillance Act (FISA).

*The Motions*

On June 17, 1985, the defendants filed in the United States District Court for the Central District of California, a motion to quash "certain subpoenas issued by this Court insofar as those subpoenas seek disclosure of evidence obtained by the United States Government pursuant to the Foreign Intelligence Surveillance Act." Alternatively, the defendants "request(ed) this Commission to suppress from evidence and prohibit disclosure of all evidence obtained, directly or indirectly, pursuant to the Foreign Intelligence Surveillance Act." While the alternative application was addressed to the Commission in this filed motion, on oral argument defendants' counsel contended that this motion to suppress should, like the motion to quash, be decided by me as a district judge, at least in the first instance, and not by the Commission. It is further noted that in a separate motion, also filed on June 17, 1985, the defendants addressed a motion "To Suppress Evidence Derived from Electronic Surveillance and for Discovery Related Thereto" to "this Court, the Honorable Mr. Justice Eugene Ewaschuk and the Honorable Frederick Lacey, United States District Judge, presiding." For the reasons already stated, I will also decide this motion acting in my judicial capacity rather than as a Commissioner.

Defendants' motions, after stating that the introduction of the challenged evidence would violate United States law, further explained the legal theory on which they were proceeding, as follows:

## PERTINENT LAW

A. Method of Challenging Disclosure of Wiretap Evidence

The Commission now in session was established on June 12, 1985 pursuant to Title 28, United States Code, Section 1782. The purpose of the Commission is to gather evidence in a pending criminal prosecution in Canada in which the three defendants who bring this motion are accused. Where a defendant challenges the compulsory production of evidence under 28 U.S.C. Section 1782 for use in a foreign criminal proceeding, the appro-

---

1. The Crown has given to the defendants a list of the 31 conversations it intends to tender in evidence. Other testimony and evidence, not implicating the Foreign Intelligence Surveillance Act, has heretofore been presented to the Commission.

priate method to challenge the legality of such process is a motion to quash the underlying subpoena. *In re Letter Rogatory from the Justice Court, District of Montreal, Canada,* 523 F.2d 562, 564 (6th Cir.1975).

Additionally, the defendants seek to prohibit disclosure before this Commission of the evidence in question on the basis of the provision in 28 U.S.C. Section 1782 that evidence may not be compelled "in violation of any legally applicable privilege." The traditional definition of an evidentiary privilege is a rule giving a person a right, *inter alia,* to refuse to disclose information, or to prevent someone else from disclosing the information, to a tribunal that would otherwise be entitled to demand and make use of that information in performing its assigned function. Wright and Graham, Federal Practice and Procedure: Evidence Section 5422, p. 667. The defendants seek to do precisely that: prevent disclosure by the subpoenaed FBI agents of evidence of the telephone conversations intercepted pursuant to FISA. This conversation therefore falls within the ambit of "legally applicable privilege" as that phrase is used in Section 1782.

Raised by the defendants' motions are the constitutionality and appropriate application of FISA.

The following description of FISA is taken from *United States v. Duggan,* 743 F.2d 59, 69–70 (2d Cir.1984):

> *Enacted in 1978,* FISA generally allows a federal officer, if authorized by the President of the United States acting through the Attorney General (or the Acting Attorney General or the Deputy Attorney General) of the United States, to obtain from a judge of the specially created FISA Court, see 50 U.S.C. Section 1803, an order "approving electronic surveillance of a foreign power or an agent of a foreign power for the purpose of obtaining foreign intelligence information." *Id.* Section 1802(b).

> FISA contains several definitions of "foreign power" and "agent of a foreign power." Most pertinently to this case, FISA defines "foreign power" to include "a group engaged in international terrorism or activities in preparation therefor." *Id.,* Section 1801(a)(4). An "agent of a foreign power" is defined to include both "any person other than a United States person, who ... acts in the United States as ... a member of a foreign power as defined in [Section 1801(a)(4)]," *id.* Section 1801(b)(1)(A), and "any person who ... knowingly engages in ... international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power," *id.* Section 1801(b)(2)(C). Section 1801(i) defines "United States person" to include "a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in Section 1101(a)(20) of Title 8), [and] an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence."

> The Act defines "foreign intelligence information," in part as

> > (1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—

> > . . . . .

> > (B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

> > . . . . .

> > (2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to—

> > (A) the national defense or security of the United States; or

> > (B) the conduct of the foreign affairs of the United States.

> *Id.* Section 1801(e). "International terrorism" is defined to include activities that—(1) involve violent acts or acts dangerous to human life that ... would be a criminal violation if committed within the

jurisdiction of the United States or any State;

(2) appear to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by assassination or kidnapping; and

(3) occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.

*Id.* Section 1801(c).

A federal officer making application for a FISA order approving electronic surveillance must include in his application, *inter alia*, "the identity, if known, or a description of the target of the electronic surveillance," *id.* Section 1804(a)(3); "a statement of the facts and circumstances relied upon by the applicant to justify his belief that ... the target of the electronic surveillance is a foreign power or an agent of a foreign power," *id.* Section 1804(a)(4); and a certification by the Assistant to the President for National Security Affairs, or an executive branch designee of the President that, *inter alia*, the certifying official deems the information sought to be foreign intelligence information and that the purpose of the surveillance is to obtain foreign intelligence information, together with a statement of the basis for the certification that the information sought is the type of foreign intelligence information designated, *id.* Section 1804(a)(7). When the target is a United States person, the government is required to minimize the acquisition and retention of nonpublicly available information and to prohibit its dissemination, consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information, *id.*

Section 1801(h); and the application must set out what minimization procedures are proposed, *id.* Section 1804(a)(5).

The FISA Judge is authorized to enter an order approving electronic surveillance if he finds, *inter alia*, that

on the basis of the facts submitted by the applicant there is probable cause to believe that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided,* That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States,

*id.,* Section 1805(a)(3), and finds that the applying official has obtained the requisite authorization and has submitted the required information, *id.* Sections 1805(a)(1), (2) and (5). If the target is a United States person, the FISA Judge is not to approve surveillance unless he finds that the certifications submitted pursuant to Section 1804(a)(7)(E) are not clearly erroneous on the basis of the data before him. *Id.* Section 1805(a)(5).

In addition to notifying the defendants of its intention to introduce evidence from the FISA surveillance of the activities of the defendants, 50 U.S.C. Section 1806(c), the Crown has placed in the record the authorizations of former Attorney General William French Smith and present Attorney General Edward Meese, authorizing the use of the FISA-gathered materials in these proceedings. *See* 50 U.S.C. Section 1806(b). These materials have been made available to the defendants. Additionally, in opposing defendants' motion for discovery, the Crown urges that I conduct an *in camera* review of the underlying FISA applications and is joined in that respect and request by the United States Attorney for this district. *See* 50 U.S.C. Section 1806(f). In this connection, they have submitted in their opposition to the defendants' motions an affidavit of Attorney General Meese, dated July 12, 1985, that disclo-

sure of the FISA admissions and orders, or an adversary hearing on these materials, would harm the national security of the United States.

Accordingly, at my direction, the United States Attorney delivered the FISA applications and orders to me and I have examined them. First, it should be noted that these materials had also been reviewed *in camera* by Judge Marshall in *United States v. Kozibioukian,* Cr. 82–460 (July 14, 1983), who had there received a "national security" affidavit from then Attorney General Smith. Second, I conclude, as Judge Marshall did, "that the FISA documentation need not be disclosed because, in the language of Section 1806(f), such disclosure is not necessary ... to make an accurate determination of the legality of the surveillance." *See* Judge Marshall's Opinion, *supra,* pp. 3–5. *See, also, United States v. Megahey,* 553 F.Supp. 1180 (E.D.N.Y.1982), *aff'd. sub nom. United States v. Duggan, supra,* 743 F.2d at 78.

As disclosed in the Crown's initial Memorandum in opposition to the motions,[2] as part of an international terrorism investigation by the Federal Bureau of Investigation (FBI), the United States Foreign Intelligence Surveillance Court (FISC) issued an order in docket number 82–118, dated April 1, 1982, authorizing the FBI to conduct electronic surveillance of the home telephone of the target Hratch Kozibioukian. An order authorizing the continuation of that surveillance was entered by a judge of FISC in docket number 82–171 on April 28, 1982; the order in No. 82–171 also authorized the FBI to initiate microphone surveillance of the apartment of Hratch Kozibioukian. On May 14, 1982, the order in No. 82–171 was amended to authorize electronic surveillance of a new telephone number Hratch Kozibioukian had obtained at his apartment and to delete authorization for electronic surveillance of the telephone number no longer in use.

 The applications are not lengthy nor are the orders. All are straightforward and readily understood and I perceive no necessity for assistance in the form of counsel's analysis or argument. The issues here are few and well defined and do not require any extensive investigation as in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Moreover, there is no contention here that the Armenian Secret Army for the Liberation of Armenia (ASALA) is not a "foreign power" as defined in 50 U.S.C. Section 1801(a)(4)—that is, "a group engaged in international terrorism or activities in preparation therefor"; nor is there any argument by the defendants that Hratch Kozibioukian at all pertinent times was not an agent of a foreign power, as defined in Section 1806(b). In any event, I find as follows:

1. The Attorney General was properly authorized by the President to approve the applications involved;

2. The applications were made by an identified federal officer and properly approved by the Attorney General, with a finding that the applications satisfied the criteria and requirements of the FISA;

3. The target of the surveillance is identified;

4. The applicant in each instance has fully and properly set forth ample facts and circumstances to justify the belief that the target, Hratch Kozibioukian, was an agent of a foreign power at all pertinent times and that the place at which the electronic surveillance was being directed was being used, and about to be used, by an agent of a foreign power;

5. That the application set forth all statements and certifications required by FISA and such statements and certifications were not clearly erroneous;

**2.** This Memorandum actually was first submitted by the United States in *United States v. Kozibioukian,* before Judge Marshall. Because the defendants' Memorandum here was so similar to that filed in *Kozibioukian,* the Crown was permitted to use the *United States v. Kozibioukian* Memorandum here. Conversations involving Kozibioukian were there considered and at trial made public. Kozibioukian was convicted and is now in prison.

6. That the electronic surveillance was necessary to gather foreign intelligence information;

7. There was probable cause to believe that the target, Hratch Kozibioukian, a United States person, was knowingly engaging in international terrorism, or activities in preparation therefor, for or on behalf of a foreign power; and this finding was not based solely on activities protected by the First Amendment;

8. There was probable cause to believe that the place at which the electronic surveillance was directed, Hratch Kozibioukian's apartment, was to be used by an agent of a foreign power, and the electronic surveillance was necessary to gather foreign intelligence information;

9. That there was a statement of proposed minimization procedures and that they were properly drawn;

10. That the applications contained a detailed description of the nature of the information sought and the type of communications to be subjected to the surveillance;

11. That the applications included the appropriate certifications as required by 50 U.S.C. Section 1804(a)(7)(A)–(E);

12. That the applications contained a statement of the means by which the surveillance would be effected and whether physical entry would be required to effect surveillance;

13. That the applications contained statements regarding previous applications and the time required for the surveillance and otherwise conforming to Sections 1804(a)(9) and (10);

14. That the applications complied with Section 1804(a)(11);

15. That the orders demonstrated that the FISA court had complied with the requirements of 50 U.S.C. Section 1805 and had a very substantial basis for the findings made as required by this subdivision;

16. That the orders complied with the directions and requirements of Section 1805(b).

■ Finally, I find that the *ex parte in camera* review of the FISA applications and orders is lawful and does not violate the defendants' constitutional rights. *See* Opinion of Judge Marshall in *United States v. Kozibioukian,* pp. 3–5; *and see United States v. Megahey, supra,* 553 F.Supp. at 1193–94, *affd. sub nom. United States v. Duggan, supra,* 743 F.2d at 78.

In summary, upon my review of the documents submitted to me under 50 U.S.C. Section 1806(f), I find that this surveillance was authorized and conducted in conformity with the requirements of FISA and in particular that the Government's application for surveillance fully conformed to the requirements of 50 U.S.C. Section 1804 and that the orders issued by the FISC judges in this matter fully conformed to the requirements of 50 U.S.C. Section 1805. In this connection, for the reasons already stated, I find that further disclosure to the defendants or their counsel of the materials reviewed is not "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. Section 1806(f). Accordingly, so much of the defendants' motions as seek discovery are denied. *See United States v. Duggan, supra,* 743 F.2d at 77, n. 6.

The defendants in their 120–page Memorandum repeat almost verbatim the arguments raised unsuccessfully by the defendants in *United States v. Hratch Kozibioukian,* Cr. 82–460 (*see* Opinion of Judge Marshall filed June 14, 1982) and the uniformly unsuccessful attacks upon FISA made by defendants in other courts. *See United States v. Duggan, supra; United States v. Belfield,* 692 F.2d 141 (D.C.Cir. 1982); *United States v. Megahey,* 553 F.Supp. 1180 (E.D.N.Y.1982), *affd without op.,* 729 F.2d 1444 (2d Cir.1983); *United States v. Hoosepian,* Cr. 82–917 (C.D.Cal., op. filed Jan. 25, 1985); *United States v. Harper,* Cr. 83–0770 (N.D.Cal., Feb. 15, 1984); *United States v. Falvey,* 540 F.Supp. 1306 (E.D.N.Y.1982); *United States v. Bell,* Cr. 81–679 (C.D.Cal., Sept. 23, 1981).

Thus, in view of the extensive treatment given these issues, I will not engage in a detailed analysis of them.

The defendants, raising what was argued in *Kozibioukian,* contend FISA is unconstitutional. They argue first that FISA violates the Fourth Amendment because FISA orders do not constitute search warrants, there is no requirement of a finding of probable cause; because FISA does not require that a neutral and detached magistrate make an independent finding of probable cause; because FISA "does not provide for the requisite particularity"; and because it falls short of the standard, as set by Title III, 18 U.S.C. Section 2510, *et seq.* I find these contentions without merit.

As the legislative history makes clear, FISA was enacted to "reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights." Select Committee on Intelligence, Foreign Intelligence Surveillance Act of 1978, S.Rep. No. 95–701, 95th Cong., 2nd Sess. 16 (1978), U.S.Code Cong. & Admin.News 1978, pp. 3904, 3985, (hereinafter Senate Report); and because Congress was aware of "abuses of domestic national security surveillances," to end sole reliance "on executive branch discretion to safeguard civil liberties." Permanent Select Committee on Intelligence, Foreign Intelligence Surveillance Act of 1978, H.R. Rep. 95–1283, Pt. I, 95th Cong., 2d Sess. 21 (1978) (hereinafter House Report).

FISA was also enacted to settle the "unresolved" question of the applicability of the Fourth Amendment warrant requirement to electronic surveillance for foreign intelligence purpose, and to "remove any doubt as to the lawfulness of such surveillance." House Report, p. 25. The Act embodies a "legislative judgment" that the FISA procedures in the Act "are necessary to insure that electronic surveillance by the U.S. Government within this country conforms to the fundamental principles of the fourth amendment." Senate Report, p. 13.

FISA embodies procedures for conducting electronic surveillance for foreign intelligence purposes. Pertinent here, in cases of international terrorism, the United States may seek authorization to conduct electronic surveillance against any person identified as an "agent of a foreign power" when the person "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor." 50 U.S.C. Section 1801(b)(2)(C).

Contrary to defendants' claim that "activities in preparation for international terrorism" are unclear (Br., 73), "international terrorism" is specifically defined by FISA. 50 U.S.C. Section 1801(c). Based on a Fourth Amendment standard of probable cause, FISA allows employment of electronic surveillance to obtain "foreign intelligence information." The Act also requires that a high ranking executive branch official appointed by the President, with the advice and consent of the Senate, certify that the surveillance is sought for the purpose of obtaining foreign intelligence information and that such information cannot reasonably be obtained by normal investigative techniques, 50 U.S.C. Section 1804(a)(7); and that the Attorney General personally approve the filing of all applications for electronic surveillance based on his finding that such applications meet the requirements of the Act, 50 U.S.C. Section 1804(a).

■ Thus, I find that FISA contains well defined procedures under which a FISA court judge may authorize electronic surveillance for foreign intelligence and national security purposes without infringing the rights of its citizens.

■ The Supreme Court has not yet considered the constitutionality of FISA and declined to define the Fourth Amendment's requirements for national security electronic surveillance in *United States v. United States District Court,* 407 U.S. 297, 308–09, 92 S.Ct. 2125, 2132–33, 32 L.Ed.2d 752 (1972) (hereinafter referred to as *Keith* ). However, any evaluation of FISA in a Fourth Amendment context must consider that the reasonableness requirement

of the Fourth Amendment is flexible and that different standards may be applied to electronic surveillance conducted to meet other governmental interests. *Keith, supra,* 407 U.S. at 321–24, 92 S.Ct. at 2138–40. The Court wrote, *id.,* at 322–23, 92 S.Ct. at 2139:

> Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of government for intelligence information and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection.

Thus, when electronic surveillance is to be used, not for detecting crimes, but for intelligence purposes, a different set of protections may be applied consistent with the Fourth Amendment.

Congress was fully aware of this aspect of the *Keith* decision when it enacted FISA. *See,* The Senate Report (pp. 11–16), which specifically describes the distinction between the standards for arrest and prosecution and those related to foreign intelligence investigations. As the Senate Report observed: "... procedures appropriate in regular criminal investigations need modification to fit the counterintelligence context."

\* \* \* \* \* \*

The Report added:

> The departures here from conventional Fourth Amendment doctrine have, therefore, been given close scrutiny to ensure that the procedures established in [FISA] are reasonable in relation to legitimate foreign counterintelligence requirements and the protected rights of individuals. Their reasonableness depends, in part, upon an assessment of the difficulties of investigating activities planned, directed, and supported from abroad by foreign intelligence services and foreign-based terrorist groups. The differences between ordinary criminal investigations to gather evidence of specific crimes and foreign counterintelligence investigations

to uncover and monitor clandestine activities have been taken into account. Other factors include the international responsibilities of the United States, the duties of the Federal Government to the States in matters involving foreign terrorism, and the need to maintain the secrecy of lawful counterintelligence sources and methods. Senate Report, pp. 12–15.

■ The defendants' claim that the FISA procedures violate the Fourth Amendment because they differ from the standards of Title III ignores the distinctions recognized in *Keith* and elaborated on by the Congress. *See United States v. Falvey,* 540 F.Supp. 1306, 1312 (E.D.N.Y.1982):

> With the enactment of FISA, Congress has implemented the teaching of *Keith* and, by borrowing from Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. Sections 2510 *et seq.,* the general wiretap statute, *mutatis mutandis,* Congress has fashioned a statute for foreign surveillance that fully comports with the Fourth Amendment.

*Accord, United States v. Megahey, supra,* 553 F.Supp. at 1186; and see the Second Circuit's analysis in *United States v. Duggan, supra,* 743 F.2d at 72–73.

The Court of Appeals for the Second Circuit has reviewed the *Falvey* analysis in *In re Grand Jury Subpoena of Martin Flanagan,* 691 F.2d 116 (2nd Cir.1982). *Flanagan* involved the same FBI international terrorism investigation under FISA that was discussed in *Falvey.* The Court of Appeals stated: "Flanagan's contention that he should not be compelled to answer because the government's questions were derived from illegal wiretaps was rejected by' Judge McLaughlin in a thorough and carefully considered opinion with which we agree.... [T]he government's application for surveillance complied with 50 U.S.C. Section 1804 ..." *Flanagan, supra,* at 119–20 n. 2.

As to the warrant requirement of the Fourth Amendment, prior to FISA, national security electronic surveillance was specifically excluded from the scope of Title III

by Congress and left to the inherent authority of the President. 18 U.S.C. Section 2511(3). This reference to the President's inherent authority was repealed upon enactment of FISA, Section 201(c) of Pub.L. No. 95–511, 92 Stat. 1797. The Supreme Court, in *Keith,* had expressly declined to rule whether the warrant requirement of the Fourth Amendment was binding upon the President in national security electronic surveillance, 407 U.S. at 308–09, 92 S.Ct. at 2132.

Except for certain dicta by the District of Columbia Circuit that a warrant must be obtained for all electronic surveillances conducted within the United States, in *Zweibon v. Mitchell,* 516 F.2d 594, 633–51 (1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976), every other Court of Appeals which has faced the question, including this, the Ninth Circuit, has held that the President has inherent power to conduct *warrantless* electronic surveillance for gathering foreign intelligence information. *United States v. Truong Dinh Hung,* 629 F.2d 908, 912–15 (4th Cir.1980) *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982); *United States v. Buck,* 548 F.2d 871, 875–76 (9th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 263, 54 L.Ed.2d 175 (1977); *United States v. Butenko,* 494 F.2d 593, 604–05 (3rd Cir.) *(en banc), cert. denied sub nom. Ivanov v. United States,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 484 F.2d 418, 426 (5th Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). These courts hold that the Fourth Amendment warrant requirement does not apply to electronic surveillances conducted primarily for foreign intelligence purposes, *see, e.g., Butenko,* 494 F.2d at 606, and that these surveillances are inherently reasonable under the Fourth Amendment. Thus FISA, which goes beyond these cases in establishing standards for the issuance of court orders for electronic surveillance for the purpose of obtaining foreign intelligence information concerning international terrorism, is constitutional.

Defendants' argument that FISA is vague because it contains no real limits regarding who or what may be a proper surveillance target is also without merit. FISA sets out reasonable standards which must be met before any individual, even a foreign official, can become the target of a foreign intelligence surveillance and contains clear guidelines and definitions that preclude arbitrary application of these standards.

Also contrary to the defendants' arguments, FISA limits which U.S. persons may be the subject of electronic surveillance under FISA. 50 U.S.C. Section 1801(b)(2). The standards there set forth are reasonable and meet the requirements of the Fourth Amendment. The defendants' argument that a U.S. person could be targeted because of support for a foreign-based environmental group is absurd. A proposal for such surveillance would not in any way meet the standards discussed above. Nothing in FISA permits the government to conduct electronic surveillance of U.S. persons because of activities protected by the First Amendment. *See* 50 U.S.C. Sections 1801(b)(2), 1804(a)(4)(A).

Moreover, even where a U.S. person does fall within FISA's standards, the government cannot present an application until an appropriate certification has been executed by a specifically designated Presidential appointee that he deems the information sought to be foreign intelligence and that the purpose of the surveillance is to obtain foreign intelligence information. 50 U.S.C. Section 1804(a)(7)(A) and (B). Congress designed this procedure as a check on executive branch arbitrariness. House Report, p. 76.

Defendants attack the certification process by arguing that foreign intelligence information should be confined to activities that constitute a direct threat against the security interests of the United States, arguing that information concerning international terrorism is not a proper objective for foreign intelligence electronic surveillance. I reject this premise.

Section 101(e)(1)(B) of FISA, 50 U.S.C. Section 1801(e)(1)(B), shows that foreign intelligence information was expressly intended to include information concerning international terrorism activities. National security information was intended to include "information which relates to ... the ability of the United States to protect against ... terrorism." House Report, p. 48. With respect to defendants' argument that the proscribed activities must be directed against the United States in order to constitute foreign intelligence information, the legislative history of FISA explicitly states that "there is no requirement that the ... terrorism ... be directed against the United States in order for information to constitute 'foreign intelligence information,' as defined. Obviously, armed attacks and similar grave hostile acts against any nation in this interdependent world more often than not directly affect the security and foreign relations of all countries." House Report, p. 48.

In *Falvey, supra*, 540 F.Supp. at 1312, the court, addressing a similar argument in another case involving international terrorism, held:

I find that Congress has struck a reasonable balance between the government's needs for foreign intelligence information and the rights of its citizens. No one can gainsay that obtaining foreign intelligence relating to international terrorism is a legitimate object of the Executive's constitutional authority to conduct foreign policy. Indeed, to the extent that Article VI of the Constitution makes treaties the supreme law of the land, the United States is obligated to combat international terrorism under the multilateral treaty obligations it assumed as a member of the Organization of American States (*see*, OAS Convention on Terrorism, *done at* Washington, Feb. 2, 1971, *entered into force for the U.S.* Oct. 20, 1976, 27 U.S.T. 3949, T.I.A.S. 8413) and the United Nations (*see*, Convention on the prevention and punishment of crimes against internationally protected persons including diplomatic agents, *done at* New York, Dec. 14, 1973, *en-*

*tered into force for the U.S.* Feb. 20, 1977, 28 U.S.T. 1975, T.I.A.S. 8532).

The defendants also assert that the certification process makes FISA unconstitutional because the FISA court must apply a clearly erroneous standard of review to the certification, thus negating the probable cause test of FISA. The defendants also argue that FISA is unconstitutional because the certification is executed by an Executive Branch official, not a neutral and detached magistrate. These contentions are without merit.

Because an official certifies that the information sought is foreign intelligence information, it does not in and of itself mean that the surveillance may be authorized. The information must be sought from an agent of a foreign power, and the government must meet the standard of probable cause to establish that. The FISC judge must be satisfied that there is probable cause that the target of the surveillance is an agent of a foreign power and that the premises targeted are being used by the target. 50 U.S.C. § 1804(a)(4). The detailed showings necessary for the government to meet this probable cause standard fully comport with the requirements of the Fourth Amendment, and the findings that this standard has been met are made by a neutral and detached magistrate. Members of the U.S. Foreign Intelligence Surveillance Court are sitting district court judges, fully qualified to make these determinations. The certification process does not negate these requirements of FISA. *See United States v. Megahey, supra*, 553 F.Supp. at 1197.

As to the defendants' assertion that the Act does not provide for the "requisite particularity," FISA requires the judge to examine closely the government's showing that the proposed target of the surveillance is an agent of a foreign power and that the premises to be targeted are being used by the target. Vague and general assertions by the government cannot meet this close scrutiny. The fact that the determination of the type of information sought is not

made by the judge does not convert the FISA authorization into a general warrant.

In summary, FISA contains clear and specific standards identifying those foreign powers and agents of foreign powers that may be subject to electronic surveillance under its authority and specifying when they may be surveilled. These standards comply with the warrant requirement of the Fourth Amendment.

The defendants also argue that FISA is unconstitutional on its face because "trespassory bugging" cannot be authorized under a showing that does not meet the standard of probable cause. This argument has no relevance here. Electronic surveillance conducted under the provisions of FISA must, as has been stated, meet the probable cause standard; and electronic surveillance authorized under FISA satisfies the requirements of the Fourth Amendment. Congress was aware that in some instances physical entry would be necessary to effectuate a surveillance authorized under the Act, and the Act expressly empowers FISC to so authorize in its orders. *See* 50 U.S.C. §§ 1804(a)(8) and 1805(b)(1)(D); House Report p. 76. Such covert entry, pursuant to a valid authorization, is proper under the Fourth Amendment. *Dalia v. United States*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979). Examination of the application in No. 82-171, which authorized the microphone surveillance, demonstrates that the application complies with the *Dalia* rule. This challenge to FISA also must be rejected.

██ The defendants also contend that FISA violates Article III of the Constitution because the Foreign Intelligence Surveillance Court is not a proper Article III court and because the Act delegates judicial power to the Executive Branch. In addition, the defendants argue that the structure of the FISA court denies its judges their judicial independence, making the Court a rubber stamp. These arguments were raised and rejected in *Falvey, supra*, 540 F.Supp. at 1313 n. 16, and *Megahey, supra*, 553 F.Supp. at 1197 and, for

the reasons there set forth, I also reject these contentions.

The FISA court is wholly composed of United States District Court judges, who have been appointed for life by the President, with the advice and consent of the Senate, and whose salaries cannot be reduced. *See* 50 U.S.C. §§ 1803(a) and (b). The defendants' contentions that because of their limited term on the FISA court, these judges lose their Article III status, has no merit. Federal judges often serve on brief temporary assignments to fulfill the responsibilities of the Judicial Branch, and there is substantial precedent for specialized courts such as FISC: judges who serve by designation, pursuant to 28 U.S.C. §§ 291-93; three-judge courts, 28 U.S.C. § 2284(b)(1); the seven judges comprising the judicial panel on multidistrict litigation designated by the Chief Justice of the United States "from time to time," 28 U.S.C. § 1407(d); multidistrict litigation assigned to a judge for the limited purpose of "consolidated pretrial proceedings," 28 U.S.C. § 1407(b); and the Temporary Emergency Court of Appeals which hears appeals involving one statute, the Economic Stabilization Act, Pub.L. No. 92–210, § 211(b)(2), 85 Stat. 743, 749, Historical Note following 12 U.S.C.A. § 1904.

The *ex parte* nature of FISC proceedings is also consistent with Article III. Government applications for warrants are always *ex parte*. *See, e.g.,* Rule 41(a) Fed.R. Crim.P. Authorizations under Title III are issued on an *ex parte* basis. The FISA court retains all the inherent powers that any court has when considering a warrant. There is no delegation of judicial power to the Executive Branch. *See United States v. Megahey, supra,* 553 F.Supp. at 1196–97.

In summary, FISA on its face is a detailed, careful effort to provide constitutional structure to electronic surveillance to obtain foreign intelligence information.

Defendants also argue that FISA was not properly invoked in this case. Thus defendants argue that FISA was improperly applied because, in their view, the FISA

surveillance was employed for the purpose of gathering evidence for a criminal prosecution. They also claim that FISA was improperly invoked because the target's and the defendants' alleged activities did not pose a direct threat to the security interests of the United States.

More specifically, the defendants contend that the purpose for the surveillance was to gather information for a criminal prosecution, that the offenses that the target is alleged to have committed are covered under Title III, but that the government used FISA because it could not meet the probable cause requirements of Title III. Defendants misunderstand the nature of investigations to counter international terrorism.

The material examined *in camera* reveals that the applications for authorization to conduct the electronic surveillance contain certifications (as required by the Act, 50 U.S.C. § 1804(a)(7)(B)) that the electronic surveillance was sought for the purpose of obtaining foreign intelligence information as defined under the Act; and as the materials make clear, the FBI was conducting an international terrorism investigation at the time the electronic surveillance was instituted and that surveillance was sought to further that investigation.

As the Crown contends, the objectives of a counter-terrorism investigation differ substantially from those of a counter-espionage investigation. In espionage investigations, the objective may only be to identify the "spy" and his contacts, monitor their activities, and having identified the foreign agent, take no further action, all as Congress noted when enacting FISA. *See* House Report, pp. 36–37.

A counter-terrorism investigation has a different objective: to stop the terrorists from committing further acts of violence, with identification of the agents of terrorist organizations only a first step. Congress contemplated and acknowledged arrest and prosecution as a possible outcome of an international terrorist investigation. *See* Senate Report, p. 11; House Report, pp. 43–44.

Once weapons or explosives are located, they cannot be ignored and allowed to be put to use; and when international terrorists are identified, the government may well have to take protective measures against them, such as prosecution or expulsion.

Prior to the enactment of FISA, when foreign intelligence surveillances were authorized by the Attorney General without any prior judicial approval, courts looked to the purpose of the surveillance in determining legality. Thus, in *United States v. Truong, supra,* 629 F.2d at 915–16, the Fourth Circuit held that electronic surveillance instituted under the President's inherent authority in the national security area must cease when the primary focus of the investigation shifts from intelligence to criminal prosecution. Since FISA, the two courts which have addressed the issue of whether the *Truong* "primary purpose" test still applies in the context of a FISA surveillance have reached different conclusions. In *Falvey, supra,* the court held that the *Truong* "primary purpose" test no longer applied, since a FISA surveillance is authorized by court order. 540 F.Supp. at 1314. In *Megahey, supra,* on the other hand, the court indicated that the *Truong* test for warrantless foreign intelligence surveillance still applies to surveillances under FISA. Whichever view is the correct one, my analysis of the FISA materials makes it clear that the purpose of this surveillance was to gather information concerning the conduct of international terrorist activities, rather than merely gathering evidence for a criminal prosecution. Moreover, the conduct of activities in preparation for international terrorism and the commission of criminal activities are not mutually exclusive concepts. While information concerning a plan to construct a bomb may be information concerning a contemplated criminal activity, such information may also refer to an activity in preparation for international terrorism, the very kind of information sought by the FISA surveillance in this case. Plans to construct a bomb would not, for example, indi-

cate whether it would be constructed or used within the United States.

Moreover, Congress specifically intended that such information be collected. *See* House Report, p. 49.

■ Defendants also argue that to the extent FISA purports to authorize national security surveillances in circumstances where there is no direct threat to the security of the United States, it is unconstitutional. In this regard, defendants assert that unless the provisions of FISA are limited to the commission of terrorist acts against the United States, such provisions have no necessary relations to national security and therefore are improperly included under FISA. This argument is without merit.

The fact that the target's alleged activities were not directed against officials or agencies of the United States does not mean that information concerning such activities is not important to the conduct of United States foreign policy or our national security. Protection of foreign officials in the United States is of direct concern to our foreign affairs and our national security. Similarly, our foreign policy and national security would be deeply affected if, for instance, Canada or Mexico were to condone attacks on our diplomats abroad or harbor terrorists and give them safe haven for staging terrorist violence against us.

Just as the United States expects other nations to use their resources to combat terrorism directed against it, the United States must fulfill its reciprocal international obligations. The legislative history of FISA shows that Congress intended that the government be allowed to collect such information concerning international terrorism. *See* House Report, pp. 48–49; and *see United States v. Falvey, supra,* 540 F.Supp. at 1312–13.

Defendants' argument that, if the government believed that the target was engaged in activities inimical to the interests of foreign governments, it was required to obtain a wiretap order under Title III, is also lacking in merit. Within the definition of international terrorism under FISA is the requirement that such terrorist activities "involve violent acts or acts dangerous to human life that are or may be a violation of the criminal laws of the United States ... or that would be a criminal violation if committed within the jurisdiction of the United States ..." 50 U.S.C. § 1801(c)(1). If such terrorist activities against a foreign government include the commission of offenses enumerated in Title III, such information may also be collected under FISA, along with the other information about the international terrorist activities of the targeted individual. There exists no requirement under FISA limiting the collection of foreign intelligence information only to those acts of international terrorism which are not enumerated under Title III. Congress could have so limited FISA but did not.

In sum, FISA may be used to combat international terrorist activities, even though such activities may not be immediately directed against the United States.

*Minimization—50 U.S.C. § 1801(h)(1)–(4)*

■ Defendants allege that the fruits of the FISA surveillance must be suppressed due to the government's failure to comply with the minimization procedures set forth in the FISA orders authorizing the surveillance in this case. Defendants further assert the United States conceded in *Kozibioukian* that it did not minimize at all. The United States has denied this in its Memorandum submitted in the *Kozibioukian* case.

The main thrust of defendants' argument that the United States failed to properly minimize this surveillance seems to stem from the fact that an automatic tape recorder was used in the surveillance of defendants' telephone communications. Defendants seemingly believe that the use of automatic recording equipment violates the minimization requirements and that the United States is never allowed to acquire all communications, irrespective of the circumstances of the particular case. That notion, however, is directly contrary not only to FISA and its legislative history, but

also to the applicable decisional law. FISA does not prohibit the use of automatic tape recording equipment; the opposite is true, as legislative history amply demonstrates.

> In addition, in many cases it may not be possible for technical reasons to avoid acquiring *all information*. In these situations, the reasonable design of the procedures must emphasize the minimization of *retention and dissemination*. The procedures may also differ given the purpose of the surveillance.... Where the purpose of a surveillance is to gather ... information [concerning international terrorism], however, some flexibility must be provided with respect to the retention of information concerning U.S. persons. Innocuous-sounding conversations may in fact be signals of important activity; information on its face innocent when analyzed or considered with other information may become critical. [Emphasis added] House Report, p. 55.

Thus it is clear that minimization may occur at any of several stages, including recording, logging, indexing, or dissemination. What is appropriate minimization in one case may not be in another; however, under the circumstances of this case, I find that the minimization procedures followed by the FBI comport with the circumstances of the case and the requirements of the Act.

In responding to the United States' *Kozibioukian* Memorandum, the defendants have not disputed the following government statements.

First, many of the intercepted conversations were in the Armenian language. Thus, only by recording the communications in full could the FBI be sure of being able to translate them fully and understand accurately what the defendants and others were saying. Recording was necessary to prevent loss of fragile information.

Second, also undisputed (and supported by the materials examined) is the government assertion that, while some of the conversations concerning planned terrorist activities were in unambiguous language, speakers often used "coded or cryptic

terms" in an apparent effort to thwart any electronic surveillance which might be taking place. For example, on April 8, 1982, after being notified in veiled terms of the attempted assassination of Kemalettin Kani Gungor, the Turkish Commerical Counselor to Canada, Hratch Kozibioukian proceeded to call another individual, notifying him that "it has happened." The individual asked Kozibioukian if the thing happened in "the land of the snow" (apparently referring to Canada). Kozibioukian answered in the affirmative. As another example, it is stated that on May 28, 1982, at about midnight, the FBI intercepted a cryptic telephone conversation between Hratch Kozibioukian and Chirinian and another individual, wherein the party at the other end indicated, in veiled terms, that Kozibioukian and Chirinian should consider targeting a Canadian entity to "help the boys in Canada."

As the legislative history of FISA set forth above indicates, Congress recognized the need for acquiring all communications in those instances where coded or cryptic language may be used. In such instances, the minimization occurs in the summarization, retention and dissemination stages, rather than at the acquisition stage.

Similarly, in counter-terrorism and counterintelligence investigations, Congress recognized that a certain latitude need be given in retaining information concerning U.S. persons who may be involved in clandestine intelligence or international terrorism activities. *See* House Report, p. 58. Thus, Congress intended that in counterintelligence and counter-terrorism cases the government have the opportunity to analyze the information it is acquiring, particularly where, as here, most of the critical conversations occurred in the Armenian language. The monitoring of targets who speak a foreign language raises additional concerns justifying the need for automatic tape recording. Any requirement for the live monitoring of all such conversations would place unrealistic constraints on the resources of the government. *See also, Scott v. United States,* 436 U.S. 128, 141,

98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), dealing with minimization in a Title III context. I find that under the circumstances automatic recording does not violate minimization requirements of the orders or FISA.

Next, on the minimization issue, the statistical analysis presented by the defendants is less than convincing. *See Scott, supra*, 436 U.S. at 140, 98 S.Ct. at 1724. Given the FISA emphasis in the minimization context upon retention and dissemination, as well as acquisition, and the unchallenged statement by the United States in *Kozibioukian* that only pertinent conversations were summarized and retained, I conclude that the minimization requirements in the FISA orders were not violated. Parenthetically, Judge Marshall did not find the minimization arguments presented by the defendants there (including the target, Kozibioukian) persuasive either.

Given my disposition of the minimization argument, I need not consider the argument of the Crown that the defendants in this proceeding are without standing to raise the argument. It should be noted, however, that the only reason for making a minimization analysis under 50 U.S.C. § 1801(h)(1)–(4) is because the target, Kozibioukian, was, at the time of the surveillance, a United States person. The defendants in this case are not. It should also be noted that of the 31 communications the Crown has indicated it will offer, only 6 involve Kozibioukian. Finally, Kozibioukian was, as has been stated earlier, tried and convicted, and conversations he engaged in have been made a part of the public record. There is, therefore, more than a little force to the argument that, even if there were a violation of the minimization requirements, either in the acquisition, retention, or dissemination of Kozibioukian's conversations, the defendants (even though they be "aggrieved persons" under FISA, §§ 1801(k) and 1806(e)), should not be able to benefit from it.

Up to this point, as I have noted, the defendants' arguments have consisted largely of what is a repetition of what was put before Judge Marshall and attacks made upon FISA and rejected not only by her but by every court to which they have been addressed.

At this point I turn to certain additional arguments raised by the defendants.

They argue that the introduction at a foreign criminal trial, here, in Canada, of the evidence obtained as a result of electronic surveillance conducted under the authority of FISA, violates the provisions of that statute.

■ I find no statutory bar to the use in a foreign criminal proceeding of FISA materials, absent any "United States person" involvement, if the statutory requirements of § 1806(b) are met. This provision states that "[n]o information requested pursuant to this chapter shall be disclosed for law enforcement purposes unless such disclosure is accompanied by a statement that such information or any information derived therefrom, may only be used with the advance authorization of the Attorney General." Such statement and authorization have been filed here and I find them to be in accordance with the spirit and letter of the statute.

The defendants have attacked the Meese authorization as a "conditional one". I do not find that the condition nullifies the authorization. Indeed, the cooperation sought is manifest in this proceeding where the Crown and the United States Justice Department are coordinating their personnel and efforts.

The defendants' argument that Congress, in dealing with use of FISA materials by the United States and the states in subdivisions (c) and (d) of § 1806, intended thereby to implicitly limit the use of such materials to those jurisdictions, is strained and without merit. Indeed, defendants' counsel, in so arguing, conceded that the legislative history of the Act reveals that Congress intended that there be disclosure and use to "persons" (*see* § 1801(m)) other than the United States and the states. This portion of the defendants' argument thus is rejected.

■ While not argued by the defendants, I also must consider the extent to which § 1806(a) bears consideration on the issues before me. This section provides:

(a) Information acquired from an electronic surveillance conducted pursuant to this chapter concerning any United States person may be used and disclosed ... without ... [his] consent ... only in accordance with the minimization procedures required by this chapter ... No information acquired from an electronic surveillance pursuant to this chapter may be used or disclosed by Federal officers or employeed except for lawful purposes.

Section 1806(a), fairly read, does not bar use of conversations of non-United States persons. The opening sentence clearly was intended to protect "United States persons" from having their conversations freely and widely disseminated without restriction. Thus, where a target was not a "United States person," but conversations of a "United States person" were overheard, the latter would have the protection of 1806(a). It also follows that the fact that the target is a "United States person," as is Kozibioukian, should not and does not mean that *every* conversation over the tapped telephone between non-"United States persons", should enjoy the protection of § 1806(a).

Of the 31 conversations here tendered, Kozibioukian was a party to only 6. Only these can be said to be covered under § 1806(a). Since the Crown and the United States have not demonstrated his consent to their disclosure, I now must analyze the applicable minimization procedures as to them.

As earlier noted, the minimization procedures of the statute are found in § 1801(h), which provides:

(1) specific procedures, which shall be adopted by the Attorney General, that are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;

(2) procedures that require that nonpublicly available information, which is not foreign intelligence information, as defined in subsection (e)(1) of this section, shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance;

(3) notwithstanding paragraphs (1) and (2), procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes; and

(4) notwithstanding paragraphs (1), (2), and (3), with respect to any electronic surveillance approved pursuant to section 1802(a) of this title, procedures that require that no contents of any communication to which a United States person is a party shall be disclosed, disseminated, or used for any purpose or retained for longer than twenty-four hours unless a court order under section 1805 of this title is obtained or unless the Attorney General determines that the information indicates a threat of death or serious bodily harm to any person.

Thus we see that any minimization procedures adopted by the Attorney General pursuant to the statute shall "prohibit the dissemination of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce and disseminate foreign intelligence information" (subd. (h)(1)); that foreign intelligence information that is related to international terrorism is not subject to the limitations of subdivision (h)(2); and that the Attorney General, "notwithstanding paragraphs (1) and (2)", is to adopt procedures for disclosure of foreign intelligence infor-

mation "that is evidence of a crime" and that is to be retained or disseminated for law enforcement purposes. (subd. (h)(3)). Subdivision (h)(4) is here applicable.

Minimization procedures have been adopted by the Attorney General pursuant to § 1801(h) and are found within the applications and orders I have reviewed. Parenthentically, these procedures have periodically undergone legislative review under § 1808 of FISA.

I have reviewed "Section 5—Dissemination," the pertinent portion of the Attorney General's minimization procedures, and, mindful of the statutory directive of § 1806(f), state again that I perceive no need for disclosure to counsel, for the reasons earlier stated. Suffice it to say that I find that the material sought to be used is (a) foreign intelligence information and (b) evidence of a crime, and that appropriate authorizations and approvals have been forthcoming from the Attorney General.[3]

## CONCLUSION

For the foregoing reasons, the defendants' motions to quash the subpoenas and to suppress evidence are DENIED.

## SUPPLEMENTAL OPINION

This Memorandum Opinion supplements that filed on August 5, 1985.

In argument before the Court and the Commission on August 6, 1985, facts were developed that heretofore the defendants had not disclosed. It is appropriate, therefore, that these be set forth, along with my findings.

Ms. Marlys Edwardh, counsel for defendant Kevork, responding to a suggestion from Crown counsel, admitted that she had received the transcripts for as least 4 or 5 conversations of the 31 tendered in this proceeding (which the defendants have moved to suppress) from Mr. Charles Garry, a California attorney; that Mr. Garry was in possession of the FISA-gathered evidence by reason of his representation of

Hratch Kozibioukian in *United States v. Kozibioukian* before Judge Marshall; and that Mr. Garry had made this evidence available to Ms. Edwardh with Mr. Kozibioukian's consent and free of any restraint or protective order.

It is thus clear that there can be no contention here that I should be concerned about protecting the privacy of the defendants in this case, or of Kozibioukian. It is equally clear that there was no protective order issued in the *Kozibioukian* proceeding and that all of the overheard conversations have been treated as in the public domain.

---

**3.** For purposes of appellate review I am filing herewith under seal my analysis of the application of the Attorney General's minimization procedures to the Kozibioukian conversations.